JAMES F. McKAY III, Judge.
The defendant, Nolan Grimes, appeals his convictions and sentences for three counts of aggravated rape, two counts of aggravated kidnapping, and two counts of sexual battery, involving two victims. Finding no patent errors and no merit to any of his three assignments of error, the defendant’s convictions and sentences are affirmed.
STATEMENT OF THE CASE
The defendant, Nolan Grimes, was charged by grand jury indictment on October 9, 2008, in Count One with forcible rape, a violation of La. R.S 14:42.1 (this count was nolle prosequied on June 5, 2009); in Counts Two, Five, and Six with aggravated rape, violations of La. R.S. 14:42; in Counts Three and Seven with aggravated kidnapping, violations of La. R.S. 14:44; in Counts Four and Eight with sexual battery, violations of La. R.S. 14:43.1.
*1009 The defendant pleaded not guilty at his October 22, 2008 arraignment. The trial court denied the defendant’s motion to suppress the evidence on March 6, 2009. The trial court denied the defendant’s motion to sever the offenses on September 2, 2010. On September 2, 2010, and November 15, 2010, the trial court ruled that evidence of different other crimes committed by the defendant was admissible. The defendant was tried by a twelve-person jury on December 7-10, 2010, and found guilty as charged. On April 11, 2011, the trial court sentenced the defendant to life imprisonment at hard labor on Counts Two, Three, Five, Six and Seven, and ten years at hard labor on Counts Four and Eight, all sentences to be served without benefit parole, probation, or suspension of sentence, and to run concurrently. It is from this verdict and sentencing that the defendant now appeals to this Court.
FACTS
The defendant was convicted in Counts Two, Three and Four for, respectively, the July 22, 1998 aggravated rape, aggravated kidnapping, and sexual battery of T.B.[1]; he was also convicted in Counts Five, Six, Seven and Eight for, respectively, the January 2, 1997 aggravated vaginal rape, aggravated anal rape, aggravated kidnapping, and sexual battery of D.J. Other crimes evidence of the sexual assaults of three other victims and the kidnapping of another victim was introduced at trial.
J.W. testified that on the night of April 28,1989 she was living in New Orleans and went out dancing at a club. She wanted to leave. But her friend did not. She went outside, where a black male in a red mustang pulled up and asked her if she wanted or needed a ride. She remembered nothing about the man’s appearance, except his ethnicity. She entered the man’s car, expecting to get a ride home. She told him where she lived. But, instead of driving over the Franklin Avenue overpass to her home, the man took her under the overpass and had intercourse with her. Afterward, he said she could go. She was accosted by three males on bicycles after she walked up stairs to the top of the overpass. So, she ran screaming on the overpass trying to stop people in cars to help her. An off-duty New Orleans police officer took her home and then to the hospital, where she was examined. J.W. said on cross examination that the man who had sex with her was unarmed. She did not tell him she did not want to have sex. He did not say he was going to kill her, and she could not recall whether, in fact, he verbalized any threat to her. However, she said he let her know that she had better cooperate, and she felt intimidated.
Retired New Orleans Police Department Lieutenant Ronald Smith testified that he was with the sex crimes investigation unit from about 1981 to 1989. He investigated a forcible rape of J.W. that occurred on April 23, 1989. He collected the rape kit and transported it to the NOPD central evidence and property room. He identified the police report he prepared in the case, under item # D28513-89. His report described the perpetrator as a dark-complected black male, approximately twenty-five years of age, small build, five feet five inches tall, one hundred fifty pounds, with medium-length black curly hair. Lieutenant Smith confirmed that he wrote in his *1010 police report that the incident did not meet the criteria of a sexual offense.
T.B., the victim in Counts Two, Three and Four, testified that she was born in June 1962, and was residing in New Orleans on July 22, 1993. She was walking from one friend’s home to another’s early on that morning on North Claiborne Avenue, near Benton Street, when a car approached, and the male occupant asked if she needed a ride. She told him no, whereupon he pulled a gun and told her to get in the car. He drove her to North Dorgenois and Doral Streets, where he forced her to perform oral sex and raped her in the vehicle. He released her at Tricou Street and North Galvez Streets. She went to the hospital where they took vaginal swabs and pubic hairs from her. She spoke to police at the time. T.B. said that the District Attorney’s Office contacted her the year of trial, 2010.
Retired New Orleans Police Department Detective Dennis Dejean confirmed that he investigated the July 22, 1993 rape of T.B. in a vehicle in the 6400 block of North Dorgenois Street. He identified the police report he filed in the case under NOPD item # G34694-93. He documented that a sexual assault kit was taken from the victim at Charity Hospital and logged into the evidence and property room. He was not able to develop a suspect in the case, but the evidence was retained as standard procedure. The suspect was described as a black male in his early twenties. The victim was raped in the front seat of the perpetrator’s car.
K.M. came to New Orleans in 1996 on vacation with a friend. She was then sixteen years old. They stayed with her sister in the Magnolia Housing Project where, early one morning, a man offered her and her friend a ride in his car to get something to eat. They got something to eat and returned to the project, where her friend exited the ear to bring food to her sister. The man said something about needing to drive the car to get rid of bugs, and he drove K.M. around for a while before coming to a stop near some water. The man told K.M. that if she did not do what he told her to he would leave her in the bushes dead. He then told her to take off her clothes, which she did, whereupon he raped her vaginally. They got dressed, and he drove her back to the project. He told her he knew she was not going to call the police, and she replied that she was not, because she did not want him to hurt her. K.M. went upstairs to the apartment where she was staying, where she told her friend and her sister. They telephoned the police, who responded. She went to the hospital where she underwent an examination. She told police she did not want to return to New Orleans to testify, and signed a form, which she identified in court, so signifying and permitting police to discontinue the investigation.
D.J., the victim in Counts Five, Six, Seven and Eight, testified that on January 2, 1997, she was coming home when a car pulled up, and she was forced inside it by a man who called her a “B” and said he would Ml her. He ordered her to perform oral sex on him, but she refused and they fought for a minute before he displayed a gun and she did what he asked. He then raped and sodomized her. She talked to police that night and underwent a rape examination at the hospital. Two years ago a detective came to her residence to talk to her about the case. She told him she was not going to participate in the case because she did not know what her attacker looked like and she did not want to go through the ordeal.
Retired New Orleans Police Department Detective Alan Gressett identified his report that he wrote in K.M.’s ease. He testified that he confiscated the rape kit *1011 performed on the victim at the hospital and placed it in the evidence and property room under item # G23172-96. KM. signed a form stating that she did not wish to prosecute the case, so defendant was not arrested for the crime. Detective Gressett also identified his police report in the case of the aggravated rape of D.J., under item # A2630-97.[2] Detective Gres-sett had met with D.J. at Charity Hospital and obtained a statement from her. He completed a sexual assault or rape kit for her and turned it over to the person who was actually going to examine D.J. He could not say who picked up the completed rape kit from the hospital and logged it in. He thought it had probably been him, but said that sometimes detectives picked up kits for other detectives. He also identified a control document under item # A02630-97, listing the sexual assault kit, the victim’s underwear, the shirt she had been wearing and pair of red stretch pants also. He said all of that evidence was placed in property and evidence. D.J. had described her attacker as a dark-complected black male, unknown height, twenty-eight to thirty years old, approximately one hundred forty pounds, thin build, with a moustache. He said police were never able to develop a suspect at the time, in 1997.
Detective Gressett replied in the negative when asked on cross examination whether, at any point in his interview with victim K.M., she indicated that the perpetrator had made any threats or statements to her inside the car. He said he would have noted that in his report if she had told him of any threats.
Retired New Orleans Police Department Sergeant Adele Bonura testified that in 1996 she supervised and participated in the investigation of a forcible rape under item # G23172-96; the rape of victim KM. Sergeant Bonura stated that a subject telephoned the office, and she answered. The subject said he thought someone might be accusing him of a rape. She told him to come in and talk about it, and the defendant came in. She read the defendant a Rights of Arrestee form, and he signed it, agreeing to make a statement. She said his date of birth given was January 16, 1962. The defendant related that he had picked up three people, including the victim, and gave them a ride to get something to eat. He said he dropped off the other two in the Magnolia Project, but that the girl took a ride with him. They went to a club, but did not enter, and ended up at the lakefront. He said they began hugging and kissing, and then he began having sex with her. He said at some point she said no, whereupon he withdrew and ejaculated on the seat of the car. The defendant told Sergeant Bonura that when they were leaving the girl seemed very upset and he thought he saw tears in her eyes. He claimed he offered to stop by a police station, but that she said no, that it was okay, whereupon he took her home.
Sergeant Bonura said the defendant was not arrested because the victim was from out of town and did not want to pursue the prosecution. She just wanted to go back home and never come back. She documented the defendant’s description at that time, in 1996, as a dark-complected Afro-American with curly short black hair, a moustache, and brown eyes. He was six *1012 feet two inches tall, weighing one hundred eighty pounds, with a medium build. The defendant provided an address of 3050 Washington Street in Kenner. Sergeant Bonura recalled that the defendant had an Oldsmobile. She said that at the time K.M. was sixteen years old and the defendant was thirty-four years old.
Sergeant Bonura confirmed on cross-examination that there was no audio or video recording of her interview with the defendant, nor had she asked him to give a written statement.
J.H. moved to New Orleans in 1985 and left to live in Chicago in late 1997. J.H. testified that on the night of August 5, 1997, she was leaving a store on LaSalle Street after purchasing a pack of cigarettes when a man asked her if she wanted a ride. Before she could respond she noticed the man had a gun. He forced her into what she recalled was a truck. She was driven away and blindfolded at some point. When the vehicle stopped she was forced to orally copulate him, after he had put cocaine on his penis. She was then vaginally raped. He called her a “bitch,” telling her to do what he said, and flipped her over and raped her anally. She was in so much pain she could not exit his vehicle, so he pushed her out and drove off. She could not walk but crawled along trying to find help. Police finally came, and she was taken to Charity Hospital, where she was given a rape examination and had some medical procedures to repair her torn anal area. She identified the defendant as looking like the person who raped her. She said her attacker had curls in his hair, and she remembered his build, his complexion, and his eyes. She did not remember being contacted by anyone in law enforcement after the attack.
Former New Orleans Police Department Officer Bryant Bailey confirmed that he investigated an aggravated rape and kidnapping on August 5, 1997, under item # H06966-97. He identified the report he had written in that incident. The victim was J.H., and the kidnapping occurred at Sixth Street and LaSalle Streets. She described her attacker as a black male with a short Afro hairstyle, weighing approximately one hundred and eighty pounds. Officer Bailey retrieved all the evidence collected from the victim by the emergency room personnel, including the completed rape kit and the pants, shirt and underwear the victim had been wearing. He logged that evidence into the evidence and property room. No suspect was ever developed in the case.
Former New Orleans Police Department Detective Stephen P. Brunelle testified that in the first week of January 2005, while working for the NOPD, he was conducting an investigation into some cold cases, more specifically, rapes that had occurred in the 1990’s. He was notified that a national DNA database had found that DNA evidence collected in three cases matched — two cases from 1997 and one from 1996. Detective Brunelle found the three cases by item number. In the two 1997 cases there was no name of a suspect, but in the third, involving the 1996 alleged rape of then sixteen-year-old K.M., the defendant had identified himself to Sergeant Bonura.
Detective Brunelle ascertained that the defendant had a Kenner address. He and a Kenner detective typed up a search warrant authorizing the taking of a buccal swab from the defendant. It was signed by a judge in the Twenty-Fourth Judicial District, for the Parish of Jefferson. On March 10, 2005, Detective Brunelle and Kenner police served the search warrant on the defendant at his Kenner residence at 3050 Washington Avenue, where a Ken-ner Police Department crime lab technician obtained a buccal swab from the in *1013 side of the defendant’s cheek. The swab was wrapped and sealed, and he took it to the central evidence and property room for recordation and transfer to the crime lab. He then filled out requests for comparison of the DNA profile from that buccal swab to the DNA profiles in the two cases from 1997 and the one from 1996. Because of Hurricane Katrina, he did not receive the results for several years, until shortly before he left the department, which was in November 2008.
Jefferson Parish Sheriffs Office Sergeant Chad Pitfield testified that on March 10, 2005, he was employed with the Ken-ner Police Department Crime Lab. He assisted in the execution of a search warrant for the taking of a buccal swab. He received a buccal kit from NOPD detectives who accompanied Kenner detectives to the scene, and he took the buccal swab. He subsequently placed it in an envelope and turned it over on the scene to NOPD detectives.
New Orleans Police Detective Jounay Ross testified that she conducted a followup investigation into victim D.J.’s 1997 rape. After receiving documentation indicating a DNA match to the defendant as the suspect, she located D.J. and asked her if she knew the defendant and if she had engaged in consensual sexual intercourse with him. D.J. did not know the defendant nor had she had consensual sex with him. Detective Ross then obtained an arrest warrant for the defendant for aggravated rape, second degree kidnapping, and aggravated crime against nature.
Detective Ross also followed up on another cold case rape, under item # D28513-89, involving the rape of victim J.W., in which she received information of a DNA match to the defendant. She located J.W., who advised her that she did not know the defendant nor had she engaged in consensual sexual intercourse with him. The defendant was then arrested and booked with that rape. The third cold case Detective Ross worked on was under item # G34694-93, involving the rape of and forced oral copulation -with victim T.B. She located T.B., who advised her that she did not know the defendant nor had she engaged in consensual sexual intercourse with him. Detective Ross notified the warrant squad, and the defendant was arrested and booked with aggravated rape and aggravated crime against nature for those offenses. Detective Ross also obtained a search warrant for a buccal swab from the defendant, in the event it might be needed. Detective Ross executed the warrant, obtained the buccal swab, and submitted it to central evidence and property. She identified the defendant in court as the person from whom she took that buccal swab.
Gina Pineda was qualified by the court as an expert in the field of molecular biology and DNA analysis. She obtained a Bachelor of Science Degree, with a concentration in microbiology and chemistry, in 1996 from Louisiana State University, and a Master of Science Degree in pathology, with a concentration in forensic DNA, in 2003 from LSU Medical School in New Orleans. She worked for Reliagene Technologies, a private DNA company, from 1996 until the end of 2007, when the company was acquired by Orchid-Selmark. She continued to work for Orchid-Selmark as assistant lab director and technical leader. At the time of trial, December 2010, Pineda was operating a consulting business, GMP Forensic Consultants, consulting with different companies and agencies involved in the field of human identity DNA testing.
Ms. Pineda testified that in early 2000, Reliagene contracted with the New Orleans Police Department to perform DNA analyses on backlogged NOPD rape kits. *1014 NOPD personnel would drop off a set number of rape kits, and Reliagene would process them and report the DNA profiles back to the NOPD. Once the work was confirmed, NOPD would then upload the data into the national DNA database, known as CODIS (Combined Offender DNA Index System).
Two cases were submitted to Reliagene on June 25, 2003, one under item # A02630-97, the other under item # H06966-97, both 1997 cases. Ms. Pine-da identified State Exhibit 20 as Relia-gene’s report in the case under item # A02630-97. Two items were in the materials submitted under that item number: (1) a 112“FTA card” with some of the victim’s dried blood on it; and (2) a tube containing a swab from the rape kit. From the swab in the rape kit, a swab that had been taken from the victim’s vaginal wall, two different DNA profiles were found. The first DNA profile, the epithelial fraction — skin cells from the victim’s vaginal wall — matched the victim, and was consistent with the DNA on the reference FTA card with the victim’s blood sample on it. The seminal fluid/sperm fraction provided a full male DNA profile.
When asked if Reliagene and she had generated a report under NOPD item #H06966-97, Ms. Pineda replied in the affirmative and identified the report as State Exhibit 22. As with the first case, a FTA reference blood stain card and rape kit swab were submitted under this second item number. As with the first case, the seminal fluid/sperm cell fraction extracted from the vaginal swab provided a male DNA profile. Ms. Pineda testified that, although Reliagene was not asked to and did not compare the individual male DNA profiles to each other, she pointed out they had a common profile which meant that the same individual donated their DNA in both samples. Ms. Pineda stated that one sample did not contaminate the other sample.
A third sample was submitted to Relia-gene by the NOPD on October 3, 2003, under item # G23172-96, a 1996 case. Ms. Pineda identified Reliagene’s final report in that case as State Exhibit 24. As with the other two cases, submitted was an FTA blood stain card reference for the victim, and one vaginal swab. A male DNA profile was extracted from the seminal fluid/sperm fraction extracted from the vaginal swab. Ms. Pineda testified that the DNA profiles were the same in this third case, bearing a 1996 item number, as in the two 1997 item number cases previously discussed.
Ms. Pineda confirmed that a fourth swab from a rape kit was submitted to Reliagene for testing, under NOPD item #G34694-93, a 1993 case. That sample was submitted on April 8, 2005. When asked if she had generated a report in that case, she replied in the affirmative and identified State Exhibit 26 as that report. Ms. Pineda testified that the male DNA profile in that case, extracted from the seminal fluid/sperm extracted from the vaginal swab, matched the DNA profiles in the two 1997 cases and the 1996 case previously discussed.
A fifth vaginal swab from a rape kit was submitted on July 12, 2006 to Reliagene, under NOPD item # D28513-89, a 1989 case. She identified State Exhibit 28 as the report generated by Reliagene in that case. She testified that in this case, unlike the four previous cases discussed, there was no FTA card or other blood sample from the victim, only a vaginal swab from the victim in a rape kit. As with the four other cases a full female DNA profile was extracted from the epithelial fraction obtained from the vaginal swab, but there was no female reference blood sample for comparison. Reliagene also obtained a full *1015 male DNA profile from the seminal fluid/ sperm fraction obtained from the vaginal swab, which was consistent with the male DNA profiles obtained in the four other cases. “[T]he same sperm donor contributed their DNA to each of these five samples.” She later confirmed and stated on cross examination that they used the term “consistent with” rather than “matched” when referring to the comparison of DNA profiles. In concluding her testimony, Ms. Pineda confirmed that at no time was she ever requested by NOPD to compare all of the DNA profiles, stating that she did not make such comparisons until she was preparing for her testimony in the instant trial.
Ms. Pineda testified on cross-examination that she did not perform actual lab work in these cases. She also confirmed that machines actually produce the raw data. She confirmed on cross examination that she had to go by the paperwork submitted with the DNA samples, insofar as that the contents were in fact as listed, meaning that the vaginal swab was taken from the respective victims in the cases matching the assigned item numbers. She admitted that neither she nor any Relia-gene person was present at the time NOPD prepared the samples that they submitted for testing. She did not have any firsthand knowledge about actual NOPD procedures. She did state that all the samples were received with a proper seal and that there was nothing unusual about any of the samples received at Relia-gene.
Ms. Pineda confirmed that the analysts who conducted the testing were aware that the samples came from the NOPD. She talked about the different analysts who conducted the testing. She said these analysts would present her with their raw data and their conclusion letters, and she would make sure the conclusions drawn from the raw data were correct. She admitted, as she did when the State brought it out on direct examination, that in one of the five cases the conclusion letter had to be corrected, in that it had incorrectly described that the victim reference sample was a microfuge tube of blood (because the sample had been so described by NOPD upon presentation to Reliagene). Some two years later NOPD sent a letter clarifying that the victim reference sample in that case had been a FTA card containing a dried blood sample.
New Orleans Police Department Officer Devin Joseph was assigned to the Special Operations Division on June 14, 2008. On that date, at approximately 10:15 p.m., he and his partner, Officer Patrick Deas, conducted a traffic stop of a black Pontiac Trans Am at the intersection of Orleans Avenue and North Prieur Street. The driver immediately pulled over when the officers activated their lights, and produced his driver’s license when requested. The driver was the defendant. Officer Joseph ran the defendant’s name and learned he was wanted on a warrant for aggravated rape, aggravated kidnapping, and aggravated crime against nature. The defendant was arrested on the warrants.
New Orleans Police Department Officer George Jackson was qualified by joint stipulation as an expert in the taking, examination, and comparison of fingerprints. He identified a set of ink-rolled fingerprints that he took from the defendant that morning in court. Office Jackson also identified an arrest register containing a set of fingerprints. He testified that the left thumbprint and right middle fingerprint on the arrest register matched the respective prints on the set of fingerprints he had taken of the defendant in court that day. Officer Jackson also identified a “cert, pack” for case # 398-052, which he linked to the arrest register with the fin *1016 gerprints. The cert, pack reflected the defendant’s March 16, 1999 plea of guilty to simple kidnapping of JonTerence Carter, with the arrest location being Mirabeau Street and Wisner Boulevard.
JonTerence Carter testified that on April 4, 1998 she was walking from her mother’s house to her aunt’s residence at approximately 8-8:30 pm. A male she later identified in court as the defendant drove along trying to talk to her, asking her if she needed a ride. The defendant stopped his vehicle, a blue Firebird, and jumped out near the corner of Magnolia Street and Jackson Avenue. He grabbed her from behind. She struggled but he was able to throw her into the car and drive off. He stopped at a drive-through Daiquiri shop on Chef Menteur Highway to purchase two daiquiris, one for him and one for her, threatening to kill her if she said anything to anyone there. He tried to get her to drink the daiquiri, but did not force her to. The defendant then drove to Bayou St. John and parked. He exited the car and went to the trunk, at which point the victim kicked open the door and started running. The defendant ran after her and grabbed her by her shirt, tearing it. However, she broke free and, as she neared the road she saw a police car and flagged it down.
New Orleans Police Sergeant Duralph Hayes III confirmed that in the early morning hours of April 5, 1998 he came into contact with JonTerence Carter. He and his partner were driving north on Wisner Boulevard, coming over the Wisner overpass, when a young female came running out into the street, flagging them down. She pointed to the defendant and said that he had tried to rape her. Sergeant Hayes said he placed the defendant in handcuffs, advised him he was under investigation for rape, and also advised him of his Miranda[3] rights. He said when he first saw the defendant; the defendant was just leaning against his car shaking his head. Sergeant Hayes identified the defendant in court. He said at the time the defendant had a medium Jheri-curl type bush hairstyle, and that the defendant was perhaps a little heavier. The defendant lived in Kenner at the time. He was driving a dark-colored car with a temporary tag inside that had been taped in the window at one time, but was not at the time. The defendant was arrested for kidnapping.
Anne Montgomery, qualified by the court as an expert in the field of molecular biology and DNA analysis, testified that she was employed by the New Orleans Police Department Crime Lab from 2001 until early 2007. She was hired as a professional contractor by the City of New Orleans and tasked with setting up a DNA lab within the crime lab. She was involved in getting the DNA lab accredited. She described how local DNA index system (LDIS) DNA labs, one of which was the NOPD’s DNA lab, upload DNA profiles they obtain to the Louisiana State Police-operated state DNA index system (another LDIS) for the State of Louisiana, which in turn would upload those DNA profiles to the federal combined DNA index system (CODIS).
Ms. Montgomery testified that at some point the federal government realized there were a lot of sexual assault kits throughout the U.S. that were sitting on shelves in property and evidence rooms that had not been analyzed or processed due to manpower shortages. Consequently, the National Institute of Justice developed a grant program to provide funds to the states to help reduce the backlog and analyze those cases that had been sitting *1017 on the shelves for so long. Ms. Montgomery participated in the program, using federal grant funds to pay for private labs to process the backlogged NOPD rape kit swabs. Once the NOPD crime lab received the results from the private labs, according to CODIS rules, they had to review the case file and make sure the analysts’ controls were correct and that they agreed with the profile findings based on the raw data. She recalled that this project began in 2003. The NOPD used two labs, but the primary one was Relia-gene Technologies.
Ms. Montgomery discussed the samples submitted under NOPD item # A02630-97, # H06966-97, and # G23172-96. Ms. Montgomery went through the procedures employed by the NOPD lab in verifying the results from the raw data and ensuring that the proper protocols were followed by Reliagene. The male DNA profiles obtained under these three item numbers were all eventually uploaded into CO-DIS. She stated that the male profiles all were consistent with each other. Ms. Montgomery identified a “lead letter” sent out to NOPD notifying it that a commonality had been identified between the three cases and that it was believed that the sperm recovered in each was contributed by the same donor.
Ms. Montgomery testified that subsequently an investigator submitted a reference buccal swab from defendant to the NOPD Crime Lab in June 2005 that was processed to obtain a DNA profile for defendant. She testified that the defendant’s reference DNA profile was consistent -with the three male DNA profiles found in the vaginal swabs in the two 1997 cases and the one 1996 case, and thus he could not be excluded as the DNA donor for those three sperm samples.
Ms. Montgomery testified that on April 8, 2005, she hand-delivered a vaginal swab to Reliagene under NOPD item # G34694-93. She testified that on July 12, 2006, Jennifer Schroeder hand-delivered evidence to Reliagene under NOPD item # D28513-89. She testified that the male DNA profiles obtained from the vaginal swabs under these last two NOPD item numbers were consistent with the defendant’s DNA. She said they knew from the DNA testing that all five of the cases had one thing in common — the sperm donor. She testified that the sperm donor was consistent in all five of the cases and that the defendant could not be excluded as the donor. She said if he was not the donor, one would need to look at a huge number, “exceeding the population” (she had confirmed that the frequency was one in one hundred billion people) to find another donor who could have contributed the sperm in those cases. She testified that to her knowledge, there had never been a match of two different individuals using thirteen genetic markers, the number of markers analyzed in all five cases in the instant matter.
ERRORS PATENT
A review of the record reveals no errors patent on the face of the record.
ASSIGNMENT OF ERROR ONE
In his first assignment of error the defendant argues that he was denied his constitutional rights to confront/cross examine the analysts who actually performed the DNA tests, the results of which were instrumental in obtaining his convictions.
The defendant filed a pretrial motion in limine to bar the State from introducing “out-of-court testimonial evidence produced by DNA analysts” who were not going to be made available at trial for cross-examination; who had not been shown to be unavailable; and who had not previously been cross examined by the defendant. The defendant argued that such *1018 evidence, “[t]he various test results,” were testimonial statements that should be excluded from trial as inadmissible hearsay. He asserted that admission of such testimonial hearsay evidence would violate his Sixth Amendment right to confront the witnesses against him and his rights under La. Const. art. 1, § 16 to confront and cross examine the witnesses against him.
Thus, the defendant preserved his right to raise the issue that the trial court erred in admitting into evidence the alleged out-of-court testimonial DNA evidence in the instant case. There were five Reliagene “Forensic Test Results” reports (four two pages in length, one three pages), introduced in evidence by the State through the testimony of former Reliagene Technologies DNA expert Gina Pineda, each corresponding to evidence tested under a different NOPD item number. Blowups of one page of these five reports were also introduced in evidence.
There were also eight one-page reports introduced in evidence by the State through the testimony of DNA expert Anne Montgomery, the former director of the NOPD Crime Lab — three “Local Match Detail Reports” and five “State Match Detail Reports.” None of these reports had any indication of an NOPD item number on it. However, they all listed the DNA profile sample numbers referred to in the Reliagene reports. In addition, introduced during the testimony of Anne Montgomery was a May 2006 NOPD Crime Lab report on a reference buccal sample from the defendant. Finally, introduced during Anne Montgomery’s testimony was a 2010 one-page “Corrected Lead Letter” listing the five NOPD item numbers with corresponding NOPD lab case numbers and DNA profile sample numbers.
In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Court held that the admission of “testimonial” hearsay evidence violates the Sixth Amendment’s Confrontation Clause. The hearsay the Court found testimonial in Crawford was a recorded statement given by the defendant’s wife to police after she had been advised of her Miranda[4] rights. The statement was introduced by the State to rebut the defendant’s claim of self-defense in a stabbing case in which he was charged with assault and attempted murder. The defendant and his wife were each interrogated twice by police. The wife did not testify because of the state marital privilege, and the defendant had no other opportunity to cross examine her. The Court in Crawford left “for another day any effort to spell out a comprehensive definition of ‘testimonial’.” 541 U.S. at 68, 124 S.Ct. at 1374.
In Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), a plurality decision with one justice concurring and four justices dissenting, three “certificates of analysis” certifying that substances seized by police from the defendant contained cocaine were introduced at trial pursuant to Massachusetts law as “prima facie evidence of the composition, quality, and the net weight of the narcotic ... analyzed.” Melendez-Diaz, 557 U.S. at 309, 129 S.Ct. at 2531, quoting Mass. Gen. Laws, ch. 111, § 13. The certificates were sworn before a notary public by analysts at the State Laboratory Institute of the Massachusetts Department of Public Health, as required under the same Massachusetts statute. The defendant appealed his conviction, arguing, inter alia, that admission of the certificates violated his Sixth Amendment right to be confronted with the witnesses against him. The Appeals Court of Massachusetts rejected *1019 the claim, citing precedent that the authors of certificates of forensic analysis were not subject to confrontation under the Sixth Amendment. The Supreme Judicial Court of Massachusetts denied review.
The U.S. Supreme Court characterized the certificates of analysis as affidavits, “functionally identical to live, in-court testimony doing ‘precisely what a witness does on direct examination.’ ” Melendez-Diaz, 557 U.S. at 310-311, 129 S.Ct. at 2532 (emphasis in original), quoting Davis v. Washington, 547 U.S. 813, 830, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). The Court held that under its decision in Crawford, the analysts’ affidavits were testimonial statements, and the analysts were witnesses for purposes of the Sixth Amendment. Citing Crawford, the Court held that absent a showing that the analysts were unavailable to testify at trial and that the defendant had a prior opportunity to cross examine them, he was entitled to be confronted with the analysts at trial.
The defendant in the instant case cites a more recent Crawford progeny, Bullcoming v. New Mexico, — U.S. -, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), another plurality opinion with two justices joining the opinion in part, one justice joining in part and concurring in part, and four justices dissenting. The State in the instant case notes that Bullcoming was decided more than six months after the defendant’s convictions and two months after he was sentenced, but concedes that it may apply under U.S. v. Booker, 543 U.S. 220, 268, 125 S.Ct. 738, 769, 160 L.Ed.2d 621 (2005). The State is correct. See Griffith v. Kentucky, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)(“[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases ... pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a ‘clear break’ with the past”). The Court in Booker specifically applied the rule enunciated in Griffith to a right guaranteed by the Sixth Amendment. See also State v. Bolden, 2011-2435 (La.10/26/12), 108 So.3d 1159, (retroactively applying a June 2012 U.S. Supreme Court decision in the granting of a writ of certiorari by the State of Louisiana directed to an appellate court that had reversed the defendant’s convictions and sentences on a Sixth Amendment issue in October 2011).
The defendant in Bullcoming was arrested for driving while intoxicated (DWI). The principal evidence against him was a forensic laboratory report certifying that his blood-alcohol concentration was well above the threshold for aggravated DWI. At trial, the prosecution did not call as a witness the analyst who signed the “certificate of analyst” in the report and who in fact had been assigned to test the defendant’s blood sample. Bullcoming, — U.S. at -, 131 S.Ct. at 2710. Instead, the State introduced, over the defendant’s objection, the analyst’s finding as a “business record” during the testimony of another analyst who was familiar with the laboratory’s testing procedures, but had “neither observed nor reviewed [the analyst’s] analysis.” Bullcoming, — U.S. at -, 131 S.Ct. at 2712. The analyst’s analysis had been reviewed by a reviewer who had certified that the analyst was qualified to conduct the BAC test, and that the “established procedure” for handling and analyzing [the defendant’s] sample “had been followed.” Bullcoming, — U.S. at -, 131 S.Ct. at 2711. The New Mexico Supreme Court held that, although the blood-alcohol analysis was testimonial, the Confrontation Clause did not require the certifying analyst’s in-court testimony, finding that the live testimony of the other analyst had been sufficient.
*1020 The question presented to the Court in Bullcoming was set forth by the Court as follows, with the Court’s holding immediately following:
“[W]hether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification — made for the purpose of proving a particular fact— through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification. We hold that surrogate testimony of that order does not meet the constitutional requirement. The accused’s right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist.” (Emphasis supplied).
Bullcoming, — U.S. at -, 131 S.Ct. at 2710.
In Bullcoming, the Court flatly rejected the State’s contention that the blood-analysis report was nontestimonial in character, and thus that no Confrontation Clause question even arose. The Court found that in all material respects, the laboratory report in the case resembled those in Melendez-Diaz, noting that, like the analysts in Melendez-Diaz, the analyst in Bullcoming “tested the evidence and prepared a certificate concerning the result of his analysis.” Bullcoming, — U.S. at -, 131 S.Ct. at 2717. The Court noted that, like the certificates in Melendez-Diaz, the analyst’s certificate in Bullcoming was “ ‘formalized’ in a signed document, ... headed a‘report....’” Id. The Court also noted that, as in Melendez-Diaz, in Bullcoming a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations. Finally, the Court noted that the report form contained a legend referring to municipal and magistrate courts’ rules providing for the admission of certified blood-alcohol analyses.
In the instant case, within seven months of filing their respective appellate briefs, the United States Supreme Court rendered its decision in Williams v. Illinois, - U.S. -, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), a case involving the prosecution and conviction of a defendant in Chicago, Illinois for “aggravated criminal sexual assault” (rape), aggravated kidnapping, and aggravated robbery, all committed against a single victim in February 2000. The perpetrator was unknown at the time. A sexual assault kit was collected from the victim during a post-rape examination. Vaginal swabs from the kit were sent by the Illinois State Police (ISP) crime lab to a private laboratory, Cellmark, which sent back a report containing a male DNA profile. Meanwhile, a DNA profile had been produced by the ISP crime lab from a blood sample taken from the defendant after his August 2000 arrest on unrelated charges. After receipt of the DNA profile extracted by Cellmark from the vaginal swabs taken from the rape victim, a computer search by the ISP crime lab showed a match between that DNA profile and the known DNA profile of defendant. The victim subsequently identified the defendant in a lineup as her attacker, and he was arrested.
At the defendant’s trial in Williams, the victim testified and identified the defendant in court as her attacker. Three forensic witnesses testified for the State. An ISP forensic scientist testified that he had confirmed the presence of semen on the vaginal swabs taken from the victim and afterward had resealed the evidence and left it in a secure freezer at the ISP lab. A state forensic analyst testified that she had developed a DNA profile from the blood sample drawn from the defendant *1021 after his unrelated August 2000 arrest, and that she had entered that DNA profile into the state forensic database. Finally, a DNA expert testified that the male DNA profile produced by Cellmark from vaginal swabs taken from the rape victim matched the male DNA profile produced from the sample of the defendant’s blood. At the time Cellmark sent its DNA report to the state police lab the defendant was not a suspect in the February 2000 sexual assault, kidnaping and robbery.
The DNA expert in Williams testified at trial that notations on shipping manifests admitted as business records indicated that the vaginal swabs taken from the victim were sent by the state police lab to Cellmark, and that Cellmark had sent them back, along with a male DNA profile. The expert made no statement that was offered for the purpose of establishing how Cellmark handled or tested the sample, nor did the expert vouch for the accuracy of the DNA profile produced by Cellmark. The Cellmark laboratory report was neither admitted into evidence nor shown to the factfinder. The DNA expert did not quote or read from the report, nor did she identify it as the source of any of the opinions she expressed.
The U.S. Supreme Court framed the narrow issue presented in Williams as whether Crawford “bar[s] an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify[.]” Williams, — U.S. at -, 132 S.Ct. at 2227. The Court Isfiheld that “this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted.... Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.” Williams, — U.S. at -, 182 S.Ct. at 2228.
The Court stated that its conclusion was entirely consistent with Bullcoming and Melendez-Diaz, explaining:
In those cases, the forensic reports were introduced into evidence, and there is no question that this was done for the purpose of proving the truth of what they asserted: in Bullcoming that the defendant’s blood alcohol level exceeded the legal limit and in Melendez-Diaz that the substance in question contained cocaine. Nothing comparable happened here. In this case, the Cellmark report was not introduced into evidence. An expert witness referred to the report not to prove the truth of the matter asserted in the report, i.e., that the report contained an accurate profile of the perpetrator’s DNA, but only to establish that the report contained a DNA profile that matched the DNA profile deduced from petitioner’s blood.... The relevance of the match was then established by independent circumstantial evidence showing that the Cellmark report was based on a forensic sample taken from the scene of the crime.
Williams, — U.S. at -, 132 S.Ct. at 2240-2241.
In the instant case, however, unlike in Williams—but like in Bullcoming and Melendez-Diaz—the forensic reports that were referred to by DNA experts Gina Pineda and Anne Montgomery during their testimony at the defendant’s trial were admitted into evidence. Thus, the foregoing holding in Williams, involving a forensic DNA report that was not introduced in evidence, is not directly applicable to the facts of the instant case. However, the Court in Williams went on to set forth “a second, independent basis” for its *1022 decision, holding that “[e]ven if the report produced by Cellmark had been admitted into evidence, there would have been no Confrontation Clause violation.” Williams, — U.S. at -, 132 S.Ct. at 2228. The Court explained:
The Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose. And the profile that Cell-mark provided was not inherently incul-patory. On the contrary, a DNA profile is evidence that tends to exculpate all but one of the more than 7 billion people in the world today. The use of DNA evidence to exonerate persons who have been wrongfully accused or convicted is well known. If DNA profiles could not be introduced without calling the technicians who participated in the preparation of the profile, economic pressures would encourage prosecutors to forgo DNA testing and rely instead on older forms of evidence, such as eyewitness identification, that are less reliable. See Perry v. New Hampshire, 565 U.S. -, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012). The Confrontation Clause does not mandate such an undesirable development. This conclusion will not prejudice any defendant who really wishes to probe the reliability of the DNA testing done in a particular case because those who participated in the testing may always be subpoenaed by the defense and questioned at trial.

Id.

The Court in Williams also distinguished the forensic reports at issue in Bullcoming and Melendez-Diaz, which, it had held, qualified as testimonial statements. The Court explained:
Introduction of the reports in those cases ran afoul of the Confrontation Clause because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial....
The Cellmark report is very different. It plainly was not prepared for the primary purpose of accusing a targeted individual....
Here, the primary purpose of the Cellmark report, viewed objectively, was not to accuse petitioner or to create evidence for use at trial. When the ISP lab sent the sample to Cellmark, its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time. Similarly, no one at Cellmark could have possibly known that the profile that it produced would turn out to inculpate petitioner— or for that matter, anyone else whose DNA profile was in a law enforcement database. Under these circumstances, there was no “prospect of fabrication” and no incentive to produce anything other than a scientifically sound and reliable profile. [Michigan v. Bryant — U.S. -] at -, 131 S.Ct. [1143], at 1157, [179 L.Ed.2d 93 (2011)].
The situation in which the Cellmark technicians found themselves was by no means unique. When lab technicians are asked to work on the production of a DNA profile, they often have no idea what the consequences of their work will be. In some cases, a DNA profile may provide powerful incriminating evidence against a person who is identified either *1023 before or after the profile is completed. But in others, the primary effect of the profile is to exonerate a suspect who has been charged or is under investigation. The technicians who prepare a DNA profile generally have no way of knowing whether it will turn out to be incriminating or exonerating — or both.
It is also significant that in many labs, numerous technicians work on each DNA profile. See Brief for New York County District Attorney’s Office et al. as Amici Curiae 6 (New York lab uses at least 12 technicians for each case); People v. Johnson, 389 Ill.App.3d 618, 627, 329 Ill.Dec. 225, 906 N.E.2d 70, 79 (2009) (“[A]pproximately 10 Cellmark analysts were involved in the laboratory work in this case”). When the work of a lab is divided up in such a way, it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures.
Finally, the knowledge that defects in a DNA profile may often be detected from the profile itself provides a further safeguard. In this case, for example, Lambatos testified that she would have been able to tell from the profile if the sample used by Cellmark had been degraded prior to testing. As noted above, moreover, there is no real chance that “sample contamination, sample switching, mislabeling, [or] fraud” could have led Cellmark to produce a DNA profile that falsely matched petitioner. Post, at 2275 (KAGAN, J., dissenting). At the time of the testing, petitioner had not yet been identified as a suspect, and there is no suggestion that anyone at Cellmark had a sample of his DNA to swap in by malice or mistake. And given the complexity of the DNA molecule, it is inconceivable that shoddy lab work would somehow produce a DNA profile that just so happened to have the precise genetic makeup of petitioner, who just so happened to be picked out of a lineup by the victim. The prospect is beyond fanciful.
In short, the use at trial of a DNA report prepared by a modern, accredited laboratory “bears little if any resemblance to the historical practices that the Confrontation Clause aimed to eliminate.” Bryant, supra, at -, 131 S.Ct. at 1167 (THOMAS, J., concurring).
Williams, — U.S. at -, 132 S.Ct. at 2243-2244.
Thus, under Williams, even if forensic DNA reports are admitted in evidence without in-court testimony of the scientist/analyst who either signed the certification or performed or observed the test reported in the certification (see Bullcoming), generally, there is no Sixth Amendment Confrontation Clause violation because the reports are not testimonial.
As shown above, the Court in Williams, when distinguishing the Cellmark forensic DNA report in Williams from the two respective forensic reports in Melendez-Diaz and Bullcoming (that it found constituted testimonial statements), stressed that at the time the forensic evidence in Williams (the vaginal swabs taken from the victim) were submitted to Cellmark for DNA analysis the defendant “was neither in custody or under suspicion” and that the Cellmark DNA report “plainly was not prepared for the primary purpose of accusing a targeted individual.” Id. As can be seen from the hereinabove quoted portions of Williams, the Court differentiated the computer-generated DNA profile reports in that case from the testimonial forensic reports in Bullcoming and Melendez-Diaz on a number of grounds. While the Court did not expressly state in Williams that a DNA report prepared for the primary purpose of accusing a targeted individual *1024 would be “testimonial” evidence under the Confrontation Clause, as the forensic reports in Bullcoming and Melendez-Diaz were, the decision could very well be read that way. For that issue goes to the core of the Confrontation Clause.
In the instant case, Reliagene forensic reports of five separate male DNA profiles produced from vaginal swabs taken from five victims under five NOPD item numbers were identified and discussed during the testimony of DNA expert and former Reliagene supervisor Gina Pineda, who had certified all five reports — and confirmed the correctness of the conclusions the actual analysts had drawn from the raw DNA data. Those reports were subsequently admitted in evidence. Unlike in Williams, DNA testing of the vaginal swabs in the last two of these five cases was not initiated until after NOPD Det. Brunelle had targeted the defendant as a suspect in the first three rape cases.
Gina Pineda testified that vaginal swabs collected as evidence under NOPD item # A02630-97 and #H06966-97, both 1997 cases, were submitted to Reliagene on June 25, 2003, and that a third sample was submitted to Reliagene on October 3, 2003, under NOPD item # G23172-96, a 1996 case.
Detective Brunelle testified that in the first week of January 2005 he was conducting an investigation into some cold cases, more specifically, rapes that had occurred in the 1990’s. He was notified that a national DNA database had found that DNA evidence collected in three cases matched — two cases from 1997 and one from 1996. He used the NOPD item numbers to pull the three cases. He testified that in the two 1997 cases, involving the sexual assaults of victims D.J. and J.H., there was no name of a suspect, but that in the third, involving the 1996 alleged rape of then sixteen-year-old victim K.M., and the defendant had identified himself to Sergeant Bonura. Sergeant Bonura had initially investigated the 1996 case.
Detective Brunelle subsequently obtained a search warrant for a buccal swab from the defendant, and that warrant was executed at the defendant’s Kenner home on March 10, 2005. Detective Brunelle testified that he then filled out requests for comparison of the DNA profile from that buccal swab to the DNA profiles in the two cases from 1997 and the one from 1996. Due to Hurricane Katrina, he did not receive the results for several years, until shortly before he left the department, which was in November 2008.
Meanwhile, according to Gina Pineda, on April 8, 2005, the fourth vaginal swab at issue in the instant case was submitted to Reliagene for testing under NOPD item # G34694-93, a 1993 case involving victim T.B. A fifth vaginal swab from a rape kit was submitted to Reliagene on July 12, 2006, under NOPD item # D28513-89, a 1989 case involving victim J.W. Thus, these last two vaginal swabs were submitted by NOPD to Reliagene for testing after Detective Brunelle had targeted the defendant as a suspect; had obtained a search warrant for seizure of a buccal swab from the defendant’s mouth; and had actually obtained that buccal swab.
However, Detective Brunelle did not testify — nor did anyone else — that the last two vaginal swabs, under NOPD item # G34694-93 and # D28513-89, were submitted to Reliagene in April 2005 and July 2006 for DNA testing in order to ascertain whether one or both DNA profiles extracted from those two swabs matched either the defendant’s DNA profile that would later be extracted from the buccal swab taken from him on March 10, 2005, or matched the DNA profiles produced from the first three vaginal swabs submitted for *1025 testing in 2003. Thus, there is no evidence that the defendant was a suspect or target in the two later cases at the time the DNA profiles were requested or produced, or that the DNA profiles in those two cases were “prepared for the primary purpose of accusing” the defendant.
In State v. Bolden, 2011-2435 (La.10/26/12), 108 So.3d 1159, the Louisiana Supreme Court applied the Confrontation Clause holding in Williams to reinstate the defendant’s conviction following the Third Circuit Court of Appeal’s October 2011 reversal of that conviction.[5] In Bolden, DNA reports were admitted into evidence,[6] even though neither the analysts who processed the samples/prepared the reports, nor any supervisor who had certified the results/reports, testified at trial. The Third Circuit reversed the defendant’s conviction under Bullcoming, at the time, the latest Crawford progeny. The facts set forth in the Third Circuit’s decision indicated that the defendant in Bolden was not a target or a suspect when the DNA profiles were produced from forensic samples collected in the two rape cases for which he was eventually tried and convicted. In addition to affirming the defendant’s conviction under Williams, the Louisiana Supreme Court in Bolden also stated:
In addition, as a matter of Louisiana law, the computer printouts of the profiles developed from the victims’ samples by the two laboratories using the same software did not constitute statements of a declarant for purposes of La.C.E. art. 801 (defining a statement as an oral or written assertion by a declarant, or “a person who makes a statement”), cf. State v. Armstead, 432 So.2d 837, 839 (La.1983) (distinguishing between computer stored human statements which are hearsay and computer generated statements which are nonhearsay), and the factual assertions made by the technicians that the profiles related to the specific samples delivered to the laboratories were admissible despite their hearsay character under the business or public records exceptions to the hearsay rule in La.C.E. art. 803(6) and 803(8). Cf. Williams, 567 U.S. at -, 132 S.Ct. at 2249 (Breyer, J., concurring) (“Statements of this kind fall within a hearsay exception that has constituted an important part of the law of evidence for decades.”) (citing Fed. Rule Evid. 803(6) (“Records of Regularly Conducted Activities”); 2 J. Wigmore, Evidence §§ 1517-1533, pp. 1878-1899 (“Regular Entries”)).
Bolden, 2011-2435, p. 5, 108 So.3d at 1159.
The actual DNA profiles contained in the five Reliagene reports at issue in the instant case were generated by a computer. Thus, for this additional reason set forth in Bolden, the five DNA profiles themselves were admissible in evidence. Finally, Gina Pineda, who testified at trial, was the “certifying” analyst on the five Reliagene DNA profile reports under the respective five NOPD item numbers. Thus, even assuming for the sake of argument that the last two DNA profiles— generated after defendant was identified as a suspect in the first three cases — were “prepared for the primary purpose of ac *1026 cusing” defendant, and thus might have been considered testimonial statements/evidence covered by the Confrontation Clause, they nevertheless would have been admissible under Bullcoming and Melendez-Diaz.[7]
In addition to the five Reliagene reports, DNA expert Anne Montgomery, who was with the NOPD Crime Lab from 2001 until early 2007 and had set up the DNA lab within the NOPD Crime Lab, testified and identified DNA reports that were admitted into evidence. Three of these reports, entitled “Local Match Detail Reports,” State Exhibits 43, 44, and 45, were one-page computer-generated reports that corresponded to the first three vaginal swabs submitted to Reliagene for testing in 2003, under NOPD item numbers, #A02630-97, # H06966-97, and # G23172-96. As with the Reliagene reports, these three computer-generated DNA profiles were admissible under Williams. It can be noted that they were all printed on January 4, 2005, before defendant was targeted as a suspect.
Ms. Montgomery also identified State Exhibit 46, a May 18, 2006 seven-page NOPD DNA lab report by Jennifer Schroeder that was certified by Ms. Montgomery as DNA Technical Leader and by NOPD Captain Tami Brisset as the Commander of the Specialized Criminal Investigation Division. The report set forth the DNA profile extracted from the buccal swab taken from the defendant at his Kenner home in March 2005 and compared it to the male DNA profiles under those three previously-discussed NOPD item numbers: #A02630-97, #H06966-97, and # G23172-96.
This report set forth a number of conclusions on page five, including that the male DNA profiles obtained from the forensic evidence submitted under NOPD item numbers # A02630-97, # H06966-97, and # G23172-96 were consistent with each other and consistent with the DNA profile of the defendant. This May 2006 report was generated after the defendant had been targeted as a suspect by Detective Brunelle. Considering that the report matched the defendant’s known DNA profile to the three male DNA profiles produced from the vaginal swabs under these three NOPD item numbers, it would be hard to argue that this report was not “prepared for the primary purpose of accusing” the defendant.
Thus, this May 2006 report arguably constitutes testimonial evidence as contemplated by the Confrontation Clause. However, given that Anne Montgomery, who testified at trial, certified this seven-page report, even assuming that it might be considered testimonial evidence, the report was fully admissible under Bullcoming and Melendez-Diaz.
Ms. Montgomery also identified five one-page computer-generated reports, each entitled “State Match Detail Report”. Ms. Montgomery stated that the male DNA profiles under NOPD item # G34694-93 and # D285513-89, produced from the last *1027 two of the five vaginal swabs submitted to Reliagene on, respectfully, April 8, 2005 and July 12, 2006, were uploaded in the Louisiana LDIS and CODIS DNA databases. These “State Match Detail Reports” matched the male DNA profiles under NOPD item # G34694-93 and # D285513-89 to one or more of the male DNA profiles under the other three NOPD item numbers. These “State Match Detail Reports” were all admissible under Williams and Bolden.
Finally, State Exhibit 56, a November 8, 2010 “corrected” “lead letter” to Assistant District Attorney Margaret Parker (who prosecuted the case at trial), that was prepared and certified by Anne Montgomery and identified by her at trial, stated that a match occurred between the DNA profiles under all five NOPD item numbers. State Exhibit 56 was written long after the defendant had been targeted as a suspect and in fact was written after his 2008 arrest for the crimes. However, this lead letter does not refer to the defendant or his DNA profile. Moreover, even assuming for the sake of argument that this “lead letter” was “prepared for the primary purpose of accusing” the defendant, and thus arguably constituted testimonial evidence as contemplated by the Confrontation Clause, given that Anne Montgomery prepared and certified it, and she testified at trial, this lead letter was fully admissible under Bullcoming and Melendez-Diaz.
For all the foregoing reasons, there is no merit to the defendant’s first assignment of error.
ASSIGNMENT OF ERROR TWO
In his second assignment of error, the defendant argues that the trial court erred in admitting evidence of crimes besides those offenses for which he was being tried, those other crimes being the sexual assaults perpetrated on victims J.W., K.M., and J.H., and the kidnapping of JonTerence Carter for which the defendant was previously convicted.
La. C.E. art. 404(B)(1) states:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
The Louisiana Supreme Court set forth the applicable law in State v. Rose, 2006-0402, pp. 12-13 (La.2/22/07), 949 So.2d 1236, 1243-1244, as follows:
It is well settled that courts may not admit evidence of other crimes to show the defendant as a man of bad character who has acted in conformity with his bad character. La. C.E. art. 404(B)(1); State v. Williams, 96-1023, p. 30 (La.1/21/98), 708 So.2d 703, 725; State v. Prieur, 277 So.2d 126, 128 (La.1973). Evidence of other crimes, wrongs or acts committed by the defendant is generally inadmissible because of the “substantial risk of grave prejudice to the defendant.” Prieur, 277 So.2d at 128. However, the State may introduce evidence of other crimes, wrongs or acts if it establishes an independent and relevant reason such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or *1028 accident. La. C.E. art. 404(B)(1). The State must provide the defendant with notice and a hearing before trial if it intends to offer such evidence. Prieur, 277 So.2d at 130. Even when the other crimes evidence is offered for a purpose allowed under art. 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant’s defense. State v. Martin, 377 So.2d 259, 263 (La.1979); Prieur, 277 So.2d at 130. The State also bears the burden of proving that defendant committed the other crimes, wrongs or acts. State v. Galliano, 2002-2849, p. 2 (La.1/10/03), 839 So.2d 932, 933 (per curiam).
Although a defendant’s prior bad acts may be relevant and otherwise admissible under La. C.E. art. 404(B), the court must still balance the probative value of the evidence against its prejudicial effects before the evidence can be admitted. La. C.E. art. 403. Any inculpatory evidence is “prejudicial” to a defendant, especially when it is “probative” to a high degree. State v. Germain, 433 So.2d 110, 118 (La.1983). As used in the balancing test, “prejudicial” limits the introduction of probative evidence of pri- or misconduct only when it is unduly and unfairly prejudicial. Id. See also Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997)(“The term ‘unfair prejudice,’ as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.”). (Footnote omitted).
In addition to the notice requirement imposed on the State by La. C.E. art. 404(B)(1), La.C.Cr.P. art. 720 states that, upon motion of the defendant, the court shall order the district attorney to provide the defendant notice of the State’s intent to offer evidence of the commission of any other crime admissible under the authority of La. C.E. art. 404.
Additionally, the State must prove the defendant committed the other acts. State v. Lee, 2005-2098, p. 44 (La.1/16/08), 976 So.2d 109, 139, citing La. C.E. art. 1104 and Huddleston v. United States, 485 U.S. 681, 690, 108 S.Ct. 1496, 1501-1502, 99 L.Ed.2d 771 (1988).[8] Finally, the other crimes evidence must tend to prove a material fact genuinely at issue, and the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. Lee, supra, citing State v. Hatcher, 372 So.2d 1024, 1033 (La.1979); State v. Sutfield, 354 So.2d 1334, 1337 (La.1978).
A trial court’s ruling on the admissibility of evidence pursuant to La. C.E. art. 404(B)(1) will not be disturbed absent an abuse of discretion. State v. Everett, p. 40 (La.App. 4 Cir. 6/13/12), 96 So.3d 605, 633; State v. Gibson, 99-2827, p. 12 (La.App. 4 Cir. 4/11/01), 785 So.2d 213, 220.
The defendant does not complain that the State failed to give notice or that a Prieur hearing was not held. The record reflects that notices were given and *1029 that two Prieur hearings were held. The first, held on September 2, 2010, concerned the admissibility of evidence of defendant’s 1999 conviction for simple kidnapping in the April 1998 kidnapping of JonTerence Carter.[9] At this hearing, the defendant essentially argued that the kidnapping incident from April 1998 could not be proof of motive, preparation, or plan for incidents from 1989,1993, and 1997. The trial court found the circumstances similar to those in the two cases for which the defendant was being prosecuted, the 1993 kidnapping and sexual assault of victim T.B. and the 1997 kidnapping and sexual assault of victim D.J. The court dismissed the argument that the 1998 kidnapping offense occurred after the dates of the other two alleged offenses and thus was irrelevant. The trial court found that beyond question the instances mirrored each other.
The second Prieur hearing, held on November 15, 2010, concerned the sexual assaults of victim J.W. in 1989, victim K.M. in 1996, and victim J.H. in 1997. Forensic evidence was collected in these three cases and later tested to furnish three male DNA profiles matching the defendant’s reference DNA profile and the two male DNA profiles found in the two cases for which defendant was tried and convicted. At the November 15, 2010 Prieur hearing as to admissibility of these three other crimes cases, defense counsel argued that the probative value of the evidence was substantially outweighed by its prejudicial effect; that the evidence was essentially irrelevant; and that the State had not shown by clear and convincing evidence the defendant had committed the crimes. The trial court noted that all five of the sexual assault victims were “young females,” that there was either a use of force if the victims did not consent to getting into the vehicle or that force was used after they entered, and that, at a minimum, a rape had occurred.
In all five of the cases in which the victims were allegedly sexually assaulted, the defendant’s DNA was matched to the DNA profile extracted from the respective victim’s vaginal swab. Thus, in reviewing and comparing the facts and circumstances of the cases, the perpetrator, although his identity was not known at the time, will be referred to as the defendant.
In the July 22, 1993 case involving victim T.B., for which the defendant was prosecuted, T.B. testified that she was walking from one friend’s home to another’s early one morning on North Claiborne Avenue, near Benton Street, when a car approached. The male occupant asked if she needed a ride. She told him no, whereupon he pulled a gun and told her to get in the car. He drove her to North Dorgenois and Doral Streets, where he forced her to perform oral sex and raped her in the vehicle. He released her at another location. T.B. testified that she was born in 1962, which would have made approximately twenty-one years old at the time of the offense.
In the case involving victim D.J., for which the defendant was prosecuted, D.J., thirty-seven years old at the time of trial, testified that around 4:00 a.m. on January 2, 1997, she was on Clouet Street coming home when a car pulled up. She was forced inside by a man who called her a “B” and said he would kill her. He drove *1030 about two blocks before stopping and ordering her to perform oral sex on him. She refused. They fought for a minute before he displayed a gun and she did what he asked. He struck her in the head at one point. He then raped and brutally sodomized her.
In the 1989 case involving J.W., she testified that on the night of April 28,1989 she accepted an offer of a ride from the defendant. Instead of driving over the Franklin Avenue overpass to her home, as she expected he was going to do, defendant took her underneath the overpass and had intercourse with her. J.W. said on cross examination that the defendant was unarmed; that she did not tell him she did not want to have sex; that he did not say he was going to kill her; and that she could not recall whether, in fact, he verbalized any threat to her. However, she said he let her know that she had better cooperate, and that she felt intimidated. When he said she could go, she was accosted by three males on bicycles on the Franklin Avenue overpass, and ran screaming, trying to stop cars on the overpass to help her. The police officer who investigated the case as a forcible rape confirmed that he wrote in his police report that the incident did not meet the criteria of a sexual offense.
J.W. testified that she lived in New Orleans from 1950 until she joined the military in 1975, that she served in the military from 1975 to 1984, lived in California until 1988, then returned to live in New Orleans until Hurricane Katrina. At the time of trial she was retired, retiring from the Naval Reserve Personnel Center for the Federal Civil Service. This evidence suggests that J.W. was no less than thirty-nine years old at the time of the 1989 offense.
In the 1996 case involving victim K.M., then sixteen years old, early one morning near the Magnolia Projects, defendant offered her and her friend a ride in his car to get something to eat. They got something to eat and returned to the project, where her friend exited the car to bring food to her sister. K.M. voluntarily went driving with the defendant for a while before he stopped the car near some water. The man told K.C. that if he did not do what he told her to he would leave her in the bushes, dead. He then told her to take off her clothes, which she did, whereupon he raped her vaginally. They got dressed and he drove her back to the project.
In the 1997 case involving victim J.H., on the night of August 5, 1997, she was leaving a store on LaSalle Street (near Sixth Street) after purchasing a pack of cigarettes when defendant, whom she described as a seemingly nice guy, asked her if she wanted a ride. Before she could respond she noticed the defendant had a gun. He forced her into what she recalled was a truck. She was driven away and blindfolded at some point. When the vehicle stopped she was forced to orally copulate the defendant after he had put cocaine on his penis. She was then vaginally raped. The defendant called her a “bitch,” telling her to do what he said, and he flipped her over and sodomized her. She was in so much pain she could not exit his vehicle, so he pushed her out and drove off. J.H. was sixty-one years old at the time of trial, meaning that she was approximately forty-seven years old at the time of the offense.
In the 1998 kidnapping case, JonTerence Carter testified that on April 4, 1998 she was walking from her mother’s house to her aunt’s residence at approximately 8-8:30 pm. The defendant drove along trying to talk to her, asking her if she needed a ride. The defendant stopped his vehicle, a blue Firebird, and jumped out near the *1031 corner of Magnolia Street and Jackson Avenue. He grabbed her from behind. She struggled but he was able to throw her into the car and drive off. He stopped at a drive-through Daiquiri shop on Chef Menteur Highway to purchase two daiquiris, one for him and one for her, threatening to kill her if she said anything to anyone there. He tried to get her to drink the daiquiri, but did not force her to. The defendant then drove to Bayou St. John and parked. He exited the car and went to the trunk, at which point the victim kicked open the door and started running. The defendant ran after her and grabbed her by her shirt, tearing it. However, she broke free and was able to flag down a police car coming down the Wisner Overpass. JonTerence was born on April 12, 1983, meaning the crime occurred a little more than a week before her sixteenth birthday.
The defendant submits in his appellate brief that the trial court justified the admissions based solely on the fact that the three rapes were forced on females in the front seat of a vehicle. The defendant incorrectly asserts that other than that, the specifics in all five cases differ.
In all six cases, the five sexual assault cases in which defendant’s DNA was found, as well as the kidnapping of Jon-Terence Carter, the victims were lured into or forced into the defendant’s car. While the defendant did not employ physical force or overtly threaten victim J.W., she said he let her know that she had better cooperate, sexually, and that she felt intimidated. In all the other five cases the defendant employed various levels of force. He obviously employed whatever level of force he felt was necessary to accomplish his goal — the perpetration of a sexual assault. The lowest level of force he employed in the five sexual assaults was in the 1989 assault of J.W. In three of the other four cases in which there was a sexual assault, involving victims T.B., D.J., and J.H., defendant displayed a gun to threaten the victims. In the case of sixteen-year old K.M., he told her that if she did not do what he told her to do he would leave her in bushes dead. In the case of kidnapping victim JonTerence Carter, he jumped out of his vehicle, grabbed her by her shoulders and put her in his car, after she declined his offer of a ride. While he did not sexually assault her, one could very well argue that was because his time with her was interrupted by police arriving on the scene when she fled.
All the victims had been out in public when they encountered the defendant. All but K.M. were alone when approached. The defendant’s initial approach in all six cases was to offer the victims a ride. Three of the six victims were approached by the defendant uptown, around the Magnolia Projects. The other three were approached by the defendant downtown. All of the victims initially entered or were forced into the defendant’s vehicle under cover of darkness.
The defendant vaginally raped victims J.W. and K.M. In the case of victim T.B., defendant forced her to orally copulate him and he then vaginally raped her. In the cases of victims D.J. and J.H., defendant forced each to orally copulate him, before he raped each vaginally and then brutally sodomized each. Each assault had in common a vaginal rape. Three had in common forced oral sex and a vaginal rape. Two had in common, in addition to forced oral sex and vaginal rapes, brutal anal rapes. Sexual assault was the goal in all five sexual assault cases and the probable intended goal in the defendant’s abduction of JonTerence. The defendant only stopped to purchase a daiquiri in the course of his abduction of JonTerence Carter.
*1032 Contrary to what the trial court stated in its reasons at the November 15, 2010 Prieur hearing, all the sexual assault victims were not young. The youngest was sixteen years old; one was approximately twenty-one; one was approximately twenty-four; one was approximately thirty-nine, at least; and the fifth was approximately forty-seven; and victim JonTerence Carter was a week away from her sixteenth birthday on the night she was kidnapped. Thus, of the six -victims, four were, as a practical matter, between the ages of sixteen and approximately twenty-four, with two victims being in their late thirties.
In State v. Lee, 2005-2098 (La.1/16/08), 976 So.2d 109, involving the trial of alleged serial killer Derrick Todd Lee for one of the murders he had allegedly committed, the trial court ruled that evidence of four other murders and the attempted murder of a sixth victim, was admissible under La. C.E. art. 404(B) “for the purpose of identity, motive, plan, system, and intent.” Lee, 2005-2098, p. 47, 976 So.2d at 140. On appeal of the defendant’s conviction and death sentence, the Louisiana Supreme Court found no error in admission of the evidence. The defendant argued on appeal, as defendant in the instant case does, that the circumstances of the other crimes were not sufficiently similar to establish a signature or modus operandi identifying the perpetrator in the charged and uncharged crimes as the same man.
The Court stated that the issue was “not whether defendant committed the other crimes, but whether, as urged by the defendant, admission of that evidence at trial was unduly prejudicial because it served no other purpose than to show the bad character of defendant, and not a larger and legitimate purpose of establishing motive, intent, system, or plan.” Id.
An FBI agent qualified as an expert in criminal investigative analysis testified at the Prieur hearing in Lee as to the victims’ similarities. Her analysis indicated all the victims were attractive, successful adult women. All had “low-risk” lifestyles that would not likely put them in situations in which they could become a victim of violent crime. All the victims were alert and not incapacitated at the time their attacks began, and each had recently traveled in the area. Agent O’Toole noted the first confrontation by the victims’ attacker was in a “comfort zone,” most being in or near their homes. There were no signs of forced entry in any of the attacks. Each victim appeared to be disarmed nonviolently, with the attacks beginning only after they were subdued. All the victims were moved around their “comfort zones” during the attacks, and none of the victims appeared to have provoked their assailant’s violence and anger.
O’Toole observed that the perpetrator attacked each victim in a “high-risk” manner — at times of the day when others could have been around. She noted that the killer’s behavior was impulsive and directed at “low risk” victims, as opposed to “easier targets” like hitchhikers or prostitutes. O’Toole also found that the attacks exhibited a very consistent pattern which exemplified the attacker’s need for high risk, high thrill, and a sexual assault.
At the Prieur hearing the defendant in Lee emphasized the dissimilarities between the -victims, pointing out that the victim for whose murder he was being prosecuted died from exsanguination after being stabbed 81 times, while two of the other victims were asphyxiated, one had her throat slashed, one was bludgeoned to death, and the attempted murder victim was being strangled when her attacker was scared off by the sudden arrival of her son.
*1033 When confronted with the defendant’s contentions, Agent O’Toole explained that the difference in victim Pace’s murder resulted from the defendant’s perceived loss of control during the attack. She theorized that if Pace had backed off or attempted to escape her attacker, a different crime scene would have resulted. However, she opined that this change did not mask the other consistent traits she found prior to the attack. Additionally, Agent O’Toole noted that all but one murder victim (Ms. Colomb) died of wounds received to the neck.
The State contended at the Prieur hearing in Lee that the defendant chose victim Pace for the same reasons he chose his other victims, but that Pace may have put up more of a “fight,” one that the defendant did not expect. As a result, the crime scene was more chaotic and her murder was more brutal than the others.
The Court in Lee stated that the record showed that in Lee the State introduced at trial photographs of the victims and the crime scenes to illustrate the similarities of the physical injuries of each victim and their respective crime scenes. The State also elicited victim character testimony at trial to establish the background of each victim and to show their movements immediately before the attack.
Notably, in Lee the Court cited the DNA evidence as supportive of the admissibility of the other crimes evidence. The Court stated:
In addition to Agent’s O’Toole’s expert assessment of the commonality of these other crimes, there was one distinctive aspect of the four homicides involving Green, Kinamore, Yoder, and Colomb. As the DNA analyses shows, defendant left behind his distinct genetic signature in all four cases by depositing his virtually unique genetic material on the blouse worn by Gina Wilson Green at the time she died and on a towel in her home and in the bodies of Kinamore, Yoder, and Colomb.
Four analysts independently worked on the DNA matches. Three of the analysts, Ross, Naylor, and Poe, were employed by the same State Police Crime Lab police, but they worked from separate work stations with different computers, the fourth analyst, Booker, worked for a separate crime lab. The consistency of the DNA results, when viewed in the context of crimes involving Green, Kinamore, Yoder, and Colomb, not only produced a portrait that resembled the single attacker Agent O’Toole discussed, it also provided jurors an observable basis for concluding nothing was amiss with the DNA analysis of the samples in the Pace homicide. Moreover, the consistency of the DNA analy-ses in these other crimes further provided jurors with an experiential foundation to reliably identify defendant as Pace’s assailant. To this extent, the State’s other crimes evidence addressed any reluctance jurors might otherwise have had in returning a verdict based wholly on scientific evidence.
Lee, 2005-2098, pp. 49-50, 976 So.2d at 142.
As in Lee, the consistency of the DNA evidence in the three other crimes cases where the victims were sexually assaulted provided jurors in the instant case “an observable basis for concluding nothing was amiss with the DNA analysis of the samples in the” two cases for which defendant was being tried. Lee, 2005-2098, p. 50, 976 So.2d at 142. Moreover, “the consistency of the DNA analyses in these other crimes further provided jurors with an experiential foundation to reliably identify the defendant” as the assailant in the two cases for which the defendant was tried. Id. To this extent, the State’s oth *1034 er crimes evidence addressed any reluctance jurors might otherwise have had in returning a verdict based largely on scientific evidence.
It can also be noted that there was no evidence introduced at trial in the instant case to suggest that the six victims were anything but ordinary female residents of this city. Thus, as in Lee, these victims could be characterized as “low-risk” targets, “as opposed to ‘easier targets’ like hitchhikers or prostitutes.” Lee, 2005-2098, p. 48, 976 So.2d at 141.
The defendant in the instant case notes that some of the other crimes occurred after the offenses for which the defendant was tried. The defendant was tried for a 1993 offense and a January 1997 offense. One of the prior crimes was in 1989, one in 1996, one in August 1997, and the kidnapping of JonTerence Carter occurred in April 1998. The defendant questions the relevance and the probative value of these later crimes to show motive, intent, system, or plan.
It can be noted that in the defendant’s written memorandum in opposition to the State’s notice of intent to introduce evidence of other crimes the defendant does not argue this issue. Defense counsel did argue the issue at the September 2, 2010 Prieur hearing at which the introduction of the evidence of the defendant’s 1998 abduction of JonTerence Carter was at issue. However, the trial court clearly rejected the argument. The issue was not raised by defense counsel at the November 15, 2010 Prieur hearing at which the introduction of the evidence of the 1989, 1996, and July 1997 kidnappings and sexual assaults was at issue. However, insofar as whether the defendant preserved the issue for review as to these three other crimes, one could reasonably argue that defense counsel did not raise the issue at the November 15, 2010 hearing because the trial court had rejected it at the September 2, 2010 hearing.
It can be noted that in Lee, supra, the defendant was tried for the May 31, 2002 murder of Charlotte Murray Pace; four of the five other crimes as to which Prieur evidence was admitted occurred after Pace’s murder. All of the five murders and the one attempted murder occurred within eighteen months. The issue raised by the defendant in the instant case as to the relevance of the later crimes to the earlier crime was not discussed in Lee.
The defendant does not cite a single jurisprudential decision discussing this issue, much less a decision holding such evidence inadmissible based, to any degree, on this distinction. The defendant in the instant case does not articulate a logical argument as to why such evidence of later crimes would be less relevant or probative than evidence of other crimes committed prior to the charged offenses on the issues of motive, intent, system, or plan. There is no logical reason why any of the other crimes evidence admitted in the instant case should, for that reason, be considered less relevant or probative than evidence of other crimes committed prior to the charged offenses.
Considering all the facts and circumstances in the instant case, it cannot be said that the trial court would have abused its discretion in determining that the defendant committed all four of the offenses constituting the evidence of other crimes, that evidence of the other crimes was relevant, as in Lee, under La. C.E. art. 404(B)(1) to show motive, intent, system, or plan, and that the probative value of the evidence was not substantially outweighed by its prejudicial effect.
There is no merit to this assignment of error.
*1035 ASSIGNMENT OF ERROR THREE
In his third and final assignment of error, the defendant argues that the trial court erred in denying his motion to sever the offenses charged in Counts Two, Three and Four, as to victim T.B., from the offenses charged in Counts Five, Six, Seven and Eight, as to victim D.J. The trial court denied the defendant’s motion to sever at the September 2, 2010 hearing at which the court granted the State’s Prieur motion as to the three other crimes in which DNA evidence was found.
The joinder of the felony offenses in the instant case, including one count of sexual battery in the case of each victim (punishment therefore being confinement “with or without hard labor”), is governed by La. C.Cr.P. art. 493.2, which states:
Notwithstanding the provisions of Article 493,[10] offenses in which punishment is necessarily confinement at hard labor may be charged in the same indictment or information with offenses in which the punishment may be confinement at hard labor, provided that the joined offenses are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan. Cases so joined shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. (Footnote supplied).
Although the offenses in the instant case were perpetrated against the two respective victims three and one-half years from each other, the crimes were of the same or similar character, and thus were properly joined. However, La.C.Cr.P. art. 495.1 provides:
If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires.
The Louisiana Supreme Court set forth the applicable jurisprudence in State v. Deruise, 98-0541, p. 7 (La.4/3/01), 802 So.2d 1224, 1232, as follows:
A motion to sever is addressed to the sound discretion of the trial court, and the court’s ruling should not be disturbed on appeal absent a showing of an abuse of discretion. [State] v. Brooks, 541 So.2d [801] at 804 [(La.1989)], (citing State v. Williams, 418 So.2d 562, 564 (La.1982)). In ruling on such a motion, the trial court must weigh the possibility of prejudice to the defendant against the important considerations of economical and expedient use of judicial resources. In determining whether joinder will be prejudicial, the court should consider the following: (1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the defendant would be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile. Id. (quoting State v. Washington, 386 So.2d 1368,
*1036 1371 (La.1980)). However, the fact that evidence of one of the charges would not be admissible under State v. Prieur, 277 So.2d 126 (La.1973), in a separate trial on the joined offense, does not per se prevent the joinder and single trial of both crimes, if the joinder is otherwise permissible. State v. Davis, 92-1623, p. 9 (La.5/23/94), 637 So.2d 1012, 1019 (citing State v. Celestine, 452 So.2d 676 (1984)). Finally, there is no prejudicial effect from joinder of two offenses when the evidence of each is relatively simple and distinct, so that the jury can easily keep the evidence of each offense separate in its deliberations. Brooks, 541 So.2d at 805.
While the heinous offenses for which the defendant was tried and convicted were essentially the same as to each of the two -victims, the evidence of each was relatively simple and distinct, such that the jury could easily keep evidence of the offenses separate in its deliberations. Therefore, given that “there is no prejudicial effect from joinder of two offenses when the evidence of each is relatively simple and distinct, so that the jury can easily keep the evidence of each offense separate in its deliberations,” Demise, supra, it cannot be said that the trial court abused its discretion in denying the defendant’s motion to sever.
There is no merit to this assignment of error.
Accordingly, based on the above and forgoing, we affirm the defendant’s conviction and sentence.
AFFIRMED.
BONIN, J., concurs specially on Assignment of Error No. 1 with reasons.

. The initials of the victims will be used in opinion. See La. R.S. 46:1844(W)(barring public disclosure of the names, addresses, or identities of crime victims under the age of eighteen years and of all victims of sex offenses, and authorizing use of initials, abbreviations, etc.).

. This item number is actually # A02630-97. Detective Gressett dropped the first "0" when stating the number. Similarly, during the testimony of former NOPD Officer Bryant Bailey both he and the State omitted the "0” when referring to NOPD item # H06966-97. This only occurred with respect to these two item numbers, each having "0” as the first numeral. Henceforth, the item numbers will be referred to correctly.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. See footnote 3.

. State v. Bolden, 2011-0237 (La.App. 3 Cir. 10/5/11), 103 So.3d 377.

. The Louisiana Supreme Court noted in its decision in Bolden that the DNA reports were not admitted into evidence pursuant to La. R.S. 15:499. Neither were any of the reports in the instant case. La. R.S. 15:499, et seq., contains very specific requirements for certificates of examination and analysis of physical evidence, which certificates can be admissible as prima facie proof of the facts shown thereon.

. It is to be noted that the record contains only three of these five Reliagene reports, under NOPD item # H06966-97, # A02630-97, and # G34694-93. The defendant was convicted in the instant case of the crimes perpetrated against DJ. and T.B., the respective victims in the cases under the latter two of these three foregoing item numbers # A02630-97 and #G34694-93. The other two Reliagene reports, under NOPD item # G23172-96 and # D28513-89 were requested by this Court from the Clerk of the Orleans Parish Criminal District Court but were not delivered. However, the defendant raises no issue that the record is incomplete. Moreover, the trial transcript makes it clear that Gina Pineda certified all five of the Reliagene reports and that all five reports were admitted into evidence.

. La. C.E. art. 1104 (eff. Jan. 1, 1989), states:
The burden of proof in a pretrial hearing held in accordance with State v. Prieur, 277 So.2d 126 (La.1973), shall be identical to the burden of proof required by Federal Rules of Evidence Article IV, Rule 404.
In Huddleston, supra, the U.S. Supreme Court held that evidence is admissible at trial under Fed. Rule Evid. 404(b) (via Fed. Rule Evid. 104(b)) if it is relevant, stating that: "In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor.” Huddleston, 485 U.S. at 689-690, 108 S.Ct. at 1501.

. Both the docket master and minute entries in the record date this hearing as having occurred on September 2, 2010. However, the cover page of the hearing transcript is dated September 22, 2010. Given that the hearing transcript was transcribed after the docket master and minute entries were entered, the September 2, 2010 date reflected on those entries will be presumed to be the hearing date.

. La.C.Cr.P. art. 493 states:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.