STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2023 KA 0939

STATE OF LOUISIANA

VERSUS

BJ MCELVEEN

*Judgment Rendered:* DEC 3 0 2024

\*\*\*\*\*\*\*\*

19th Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
Suit No. 09-18-0487, Section 7

The Honorable Louise Hines, Judge Presiding

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

| | |
|---|---|
| Hillar C. Moore, III<br>District Attorney<br>Cristopher J.M. Casler<br>Assistant District Attorney<br>Baton Rouge, Louisiana | Counsel for Appellee<br>State of Louisiana |
| Jane C. Hogan<br>Louisiana Appellate Project<br>Hammond, Louisiana | Counsel for Defendant/Appellant<br>BJ McElveen |

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

BEFORE: McCLENDON, WELCH, AND LANIER, JJ.

**LANIER, J.**

The defendant, BJ McElveen, was charged by bill of information with two counts of armed robbery using a firearm, violations of La. R.S. 14:64 and La. R.S. 14:64.3, and pled not guilty.[1] After a trial by jury, he was found guilty as charged on both counts. The defendant filed two written *pro se* motions for new trial, and made an oral and written motion for post-verdict judgment of acquittal, all of which the trial court denied. The trial court sentenced the defendant to twenty-five years imprisonment at hard labor on each count, to be served concurrently, and an additional five years on each count, to be served consecutive to the twenty-five-year sentences.[2]

The defendant now appeals, assigning error to the following: (1) the sufficiency of the evidence; (2) the admission of DNA evidence and expert testimony; (3) the jury instructions; (4) the effectiveness of trial counsel; (5) the denial of his motion for new trial without a hearing; (6) the lack of a twenty-four hour delay between the denial of post-trial motions and sentencing; (7) and the imposition of excessive sentences. For the following reasons, we affirm the convictions, vacate the sentences, and remand for resentencing.

---

[1] According to the record and the defendant's brief on appeal, the defendant's full first name is BJ.

[2] While the minutes indicate the sentences were imposed without the benefit of probation, parole, or suspension of sentence, the sentencing transcript shows the trial court did not restrict benefits or state the additional five-year sentences are to be served at hard labor, without benefit of parole, probation, or suspension of sentence, as statutorily mandated. See La. R.S. 14:64(B) and La. R.S. 14:64.3(A). Where there is a conflict between the transcript and the minutes, the transcript prevails. See **State v. Lynch**, 441 So.2d 732, 734 (La. 1983); **State v. Parker**, 2023-0941 (La. App. 1st Cir. 6/27/24), 392 So.3d 652, 655, n.1. Nonetheless, when a trial court does not mention the statutory restriction of benefits, such conditions are self-activating pursuant to La. R.S. 15:301.1(A). Further, because an appellate court may correct an illegal sentence at any time and no discretion is involved regarding the requirement that the additional five-year penalty on each count be served at hard labor, this court may correct this error instead of remanding for resentencing. See La. Code Crim. P. art. 882; see also **Parker**, 392 So.3d at 662. However, as discussed in patent error review section, *infra*, the sentences must be vacated due to other trial error.

## STATEMENT OF FACTS

On July 23, 2018, at about 9:00 a.m., officers of the Baton Rouge Police Department (BRPD) and East Baton Rouge Parish Sheriff's Office (EBRPSO) were dispatched to a Capital One Bank, located at 12211 Coursey Boulevard, the scene of an armed robbery. Before the robbery, Erika Ellie-Jackson, the teller who opened the bank that day, entered and disarmed the building. Cornetta Washington, the other teller, waited in the parking lot until Ms. Jackson gave her the signal to enter. As Ms. Washington entered, two masked men abruptly came inside and told her and Ms. Jackson to get on the floor. One of the assailants pushed Ms. Washington down while the other dragged Ms. Jackson to the cash vaults. As ordered at gunpoint, Ms. Jackson and Ms. Washington opened the cash vaults. After taking over $100,000, the assailants ran across the street and then through a field. Ms. Jackson immediately pressed the alarm button and called 911.

Deputies arrived at the scene, searched the field, and recovered a camouflage backpack used in the robbery, containing wads of cash wrapped in Capital One wrappers and a loaded handgun. The backpack was sent to the Louisiana State Police Crime Lab (LSPCL) where it was processed for DNA, and presumptive DNA test results led to the identification of the defendant as a suspect. Later, after an anonymous Crime Stoppers tipster identified "BJ" as one of the robbers, the defendant was taken into custody, and his reference DNA samples were sent to the lab. Supplemental DNA testing showed the defendant's DNA was on the straps, zipper, and zipper pulls of the backpack.

## ASSIGNMENT OF ERROR NUMBER ONE

In assignment of error number one, the defendant contends the evidence, when viewed in the light most favorable to the State, was insufficient to support the convictions. He argues the DNA evidence only shows he and two other individuals touched a backpack used in the robbery. The defendant further

3

contends there was no corroboration of the tip naming him as a suspect or any other identifying evidence.

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV, § 1, La. Const. art. I, § 2. The standard of review for sufficiency of the evidence to support a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime, and the defendant's identity as the perpetrator of that crime, beyond a reasonable doubt. See La. Code Crim. P. art. 821(B); **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); **State v. Currie**, 2020-0467 (La. App. 1st Cir. 2/22/21), 321 So.3d 978, 982. When the identity of the perpetrator is at issue, the State is required to negate any reasonable probability of misidentification. A positive identification by only one witness is sufficient to support a conviction. **State v. Bessie**, 2021-1117 (La. App. 1st Cir. 4/8/22), 342 So.3d 17, 23, writ denied, 2022-00846 (La. 9/20/22), 346 So.3d 802.

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. **Currie**, 321 So.3d at 982. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable

4

doubt. **State v. Southall**, 2022-0746 (La. App. 1st Cir. 6/2/23), 369 So.3d 925, 930, writ denied, 2023-00875 (La. 2/6/24), 378 So.3d 750.

Armed robbery is defined by La. R.S. 14:64(A) as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." Furthermore, La. R.S. 14:64.3(B) provides for additional punishment if the dangerous weapon used in the commission of the armed robbery is a firearm. The defendant does not dispute that an armed robbery with a firearm occurred. He argues, however, that the evidence was insufficient to support his convictions because the State did not sufficiently prove that he was one of the armed robbers in this case.

At trial, the State presented surveillance footage, collected by Captain Justin Payer of the EBRPSO, from Capital One and United Community Bank (UCB), located across the street from Capital One. A UCB camera facing Capital One captured two blurred figures in the distance, as they emerged from trees and bushes next to Capital One. Capital One's interior surveillance footage shows the assailants then enter the bank and commit the robbery.

The first assailant to enter was wearing a dark or navy blue hoodie, had a gun in one hand, the camouflage backpack in the other, and at one point, is shown pointing the gun at Ms. Jackson's back and head. He appeared to be wearing gloves on both hands. The second assailant was wearing a gray long-sleeved shirt, a dark hooded shirt underneath, and a red and black glove on one hand. The footage shows the assailants' backs as they grabbed money from the safe and loaded it into the backpack and a white bag. After it was loaded with money, the assailant in the gray shirt touched the backpack with both of his hands, one bare and one gloved, as he grabbed it from the other assailant and put it on his back. They then exited the bank.

5

Timestamped just a few minutes after the initial UCB video from the camera facing Capital One, another UCB video from the same camera shows the assailants fleeing after the robbery. They ran across the street from the Capital One to the UCB side parking lot. A third video, facing the UCB rear parking lot, captured the assailants then running from the UCB side parking lot to its rear parking lot, with the assailant wearing a gray long-sleeved shirt still carrying the camouflage backpack on his back. The individuals' faces are not visible on any of the video footage.

Both victims, Ms. Jackson and Ms. Washington, testified they were unable to see the assailants' faces. However, they each testified the assailants spoke with a New Orleans accent. Specifically, Ms. Washington noted, when the safe did not initially open, one assailant said, "Open the vault, stop playing." One of them also said, "baby, you going to be okay," using what Ms. Washington referred to as New Orleans slang. After opening the main vault, Ms. Jackson and Ms. Washington were then instructed to open the inner vault. Once the assailants loaded the cash and exited the bank, Ms. Jackson alerted the police, as Ms. Washington stood in the door to see the direction in which the assailants fled, which was to the UCB parking lot.

Deputy Steven Gallo, one of the officers dispatched to the robbery, interviewed John Bass, a bystander who reported seeing two black males as they ran through the UCB parking lot and toward a fence line surrounding the field used to cut through a trail from Coursey Boulevard to the Southpark area. Bass indicated that one of the males had a backpack on and the other had a bunch of cash in his hands, which Bass thought looked suspicious. Bass photographed the individuals, showing their backs, as they fled on foot.

Deputy Michelle Partenheimer of the EBRPSO arrived at the scene about thirty minutes after the dispatch, received a photo of the suspects running across

the field, and searched the area on foot. Within view of the bank, Deputy Partenheimer and another deputy found a camouflage backpack under a truck bed cover. Within the vicinity, they also found a red and black glove, a bundle of wrapped cash, loose bills hidden in some tires leaning against a row house in the area, a black t-shirt, a dark blue hoodie, and a pair of camouflage gloves.[3] Of the approximate $123,600 that was stolen from the bank, nearly all of it, except an approximate $1400, was recovered.

Sergeant Jason Fitzpatrick of the EBRPSO Crime Scene Division photographed and collected the evidence. As shown in the photographs, the backpack contained stacks of cash, carbon receipts, and a Glock .40 caliber handgun with an extended magazine. He processed several items for fingerprints and/or DNA, including the money wrappers, handgun, camouflage gloves, black t-shirt, and blue hoodie, and areas at Capital One, including the door, safe handles, and the floor of the safe. He further submitted the backpack, red and black glove, and several swabs to the LSPCL.

Lieutenant Chuck Foster of the EBRPSO armed robbery and burglary division was also dispatched to the scene. He confirmed the recovered camouflage backpack matched the one in surveillance footage. He further noted the defendant is depicted touching the backpack during the robbery, and, while putting the backpack on his back as they exited the bank, was only wearing one glove.

Four days after the robbery, Lieutenant Foster received the presumptive LSPCL test results on the backpack. Lieutenant Foster and Zachary Shawhan, a DNA Forensic Supervisor at the LSPCL and expert witness in DNA forensics, testified at trial regarding the DNA results. Preliminary testing, completed July 31, 2018, yielded a DNA profile from the straps, zipper, and zipper pulls of the backpack, which was consistent with being a mixture of DNA from more than

---

[3] The red and black glove is also referenced in the record as red and gray. Additional cash was found in the UCB parking lot.

three contributors, with a major mixture of two contributors. The results were inconclusive as to any minor contributor, due to the limited nature of the contribution. The DNA profile generated from the major mixture was searched in the Combined DNA Index System (CODIS), and the defendant was identified as a suspect.[4]

While attempting to determine the defendant's whereabouts, Lieutenant Foster received a Crime Stoppers tip identifying the assailants. Lieutenant Foster testified the tip provided specific details of the robbery, not shared with the public and known only by investigating law enforcement officers and the perpetrators of the crime. In naming both assailants, the tipster identified the assailant shown in Capital One surveillance footage squatting in front of the vault as Baylon Trim (in the dark hoodie), and the other assailant (in the gray shirt) was known to the tipster by the first name BJ. At that time, the defendant's name had not been released because he was still at large, though Lieutenant Foster already had a warrant for the defendant's DNA. As Lieutenant Foster testified, the first name given by the tipster, BJ, was consistent with the presumptive identification of the DNA profile from the backpack. Lieutenant Foster further noted that in his twenty-nine years of working in law enforcement, he had not been aware of many other individuals with that first name.

With FBI assistance, Lieutenant Foster discovered the defendant had left the state and was located in Texas. After FBI communications with members of the defendant's family, the defendant turned himself in on or about August 2, 2018. At that point, Lieutenant Foster executed the warrant for the defendant's DNA and sent two reference samples to the LSPCL for comparison to the DNA samples taken from backpack. Lieutenant Foster also obtained and executed a DNA search

---

[4] Swabs taken from the red and black glove and handgun were inconclusive, due to the complex nature of the profile.

warrant for Mr. Trim, who was incarcerated at the time, and submitted his DNA to the crime lab.

Supplemental DNA testing, completed on August 9, 2018, after reference samples for Mr. Trim and the defendant were submitted to the crime lab, confirmed the defendant's DNA was on the backpack.[5] However, Mr. Trim was excluded as a major contributor to the DNA profile. In that regard, Lieutenant Foster noted one of the assailants, wearing the dark or navy blue hoodie, had gloves on both hands. Consistent with the DNA results, the assailant wearing the gray shirt, believed to be the defendant, only had on one glove and was shown in video footage handling the backpack with his ungloved hand. Lieutenant Foster further testified he learned during the investigation the defendant was from the New Orleans area.

The defendant did not testify at trial. On appeal, he argues there was no direct evidence to prove he committed the robbery. He notes neither his fingerprints nor DNA were found at the scene. He further contends there were no details or evidence to corroborate the anonymous tip.

The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. **State v. Williams**, 2001-0944 (La. App. 1st Cir. 12/28/01), 804 So.2d 932, 939, writ denied, 2002-0399 (La. 2/14/03), 836 So.2d 135. The reviewing court does not determine whether another possible hypothesis has been suggested by the defendant which could explain the events in an exculpatory fashion; rather, the reviewing court evaluates the evidence in the light most favorable to the prosecution and determines whether the alternative hypothesis is

---

[5] In accordance with the final DNA results, the defendant cannot be excluded as a major contributor to the DNA profile obtained from the straps, zipper, and zipper pulls of the backpack. Assuming two contributors, the deduced DNA profile was 2.69 billion times more likely to be observed if it had originated from a mixture of DNA from the defendant and an unknown contributor than if it had originated from two unrelated, random individuals. Mr. Shawhan testified that the DNA results consisted of a statistical DNA "inclusionary" match of the defendant's DNA to the samples taken from the backpack.

9

sufficiently reasonable that a rational factfinder could not have found proof of guilt beyond a reasonable doubt. **State v. Jones**, 2016-1502 (La. 1/30/18), 318 So.3d 678, 682 (*per curiam*).

In the instant case, presumptive test results showed the defendant's DNA was on the backpack used in the robbery, found abandoned in the field across the street from Capital One, where the assailants fled after the robbery. Consistent with the presumptive DNA match, the police received a tip naming the assailant who only had a glove on one of his hands but handled the bag with both hands as BJ, the defendant's first name. The final DNA testing of the backpack confirmed the defendant's DNA was on the backpack. While there was no other evidence to connect Mr. Trim to this case, he was identified as the assailant who had gloves on both hands.[6] Additionally, we note the tellers testified the assailants had distinct accents indicating they were from the New Orleans area, and Lieutenant Foster testified he learned the defendant was in fact from New Orleans.[7]

Furthermore, there was testimony the defendant fled the state after the robbery. Flight and attempt to avoid apprehension indicate consciousness of guilt, and therefore, are circumstances from which a juror may infer guilt. **Southall**, 369 So.3d at 933. Thus, under the facts and circumstances presented in this case, we cannot say that the jury was irrational in determining the defendant was one of the perpetrators in this case. See **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660-662.

An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict

---

[6] Consistent with video footage and testimony indicating one of the assailants was fully gloved while the other only wore one red glove during the offense, we reiterate the police recovered a pair of camouflage gloves and one red and black glove in the area where the assailants fled.

[7] On appeal, the defendant concedes in his brief he was born in New Orleans but states he moved to Baton Rouge at eight years of age. However, there was no evidence or testimony presented at trial to show he moved from New Orleans.

on the basis of an exculpatory hypothesis presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (*per curiam*). We find the jury could have rationally inferred the evidence presented by the State negated any reasonable probability of misidentification in this case. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the evidence proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, the elements of both counts of armed robbery with a firearm and the defendant's identity as the perpetrator of the offenses. Accordingly, we find no merit in assignment of error number one.

## ASSIGNMENT OF ERROR NUMBER TWO

In assignment of error number two, the defendant argues the trial court violated his right to confrontation in allowing Mr. Shawhan to testify about the supplemental DNA results, though he was not the DNA analyst who performed the testing.[8]  The defendant claims the DNA report was the only evidence that implicated him and argues its introduction was not harmless. He concedes this court resolved this issue in a mid-trial writ, but argues the instant case is distinguishable from the relied upon cases.[9]

In all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. U.S. Const. amend. VI. The confrontation clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had

---

[8] The defendant concedes the initial report did not violate his right of confrontation as it did not name him as a suspect or DNA match.

[9] See **State v. McElveen**, 2022-1066 (La. App. 1st Cir. 9/29/22), 2022 WL 4546008 (unpublished).  Although a pretrial determination does not absolutely preclude a different decision on appeal, judicial efficiency demands that this court accord great deference to its pretrial decisions unless it is apparent, in light of a subsequent trial record, that the determination was patently erroneous and produced an unjust result. **State v. Ard**, 2022-0230 (La. App. 1st Cir. 12/22/22), 361 So.3d 473, 480 n.2, writ denied, 2023-00281 (La. 9/26/23), 370 So.3d 471. Nonetheless, we elect to discuss the merits of the defendant's argument.

11

had a prior opportunity for cross-examination." **Crawford v. Washington**, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004); **State v. McIntosh**, 2018-0768 (La. App. 1st Cir. 2/28/19), 275 So.3d 1, 6, writ denied, 2019-00734 (La. 10/21/19), 280 So.3d 1175.

The **Crawford** Court drew a distinction between testimonial and nontestimonial statements and confined its holding to testimonial evidence. **McIntosh**, 275 So.3d at 6 (citing **Crawford**, 541 U.S. at 61-68, 124 S.Ct. at 1370-74). Testimonial statements, while not fully defined by the court, include those "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]" **Crawford**, 541 U.S. at 52, 124 S.Ct. at 1364.

In **Melendez-Diaz v. Massachusetts**, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), the United States Supreme Court considered whether sworn drug analysis certificates attesting that material seized by the police from the defendant contained cocaine were testimonial in nature, thus rendering the certificates' affiants "witnesses" subject to the defendant's right of confrontation. Finding that the certificates were affidavits made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial, the Court held that the lab certificates were testimonial in nature. Accordingly, absent a showing that the analysts were unavailable to testify at trial and that the defendant had a prior opportunity to cross-examine them, the affidavits were not admissible in evidence against the defendant. **Id.**, 557 U.S. at 311, 129 S.Ct. at 2532. The Court stated, "[c]onfrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well." **Id.**, 557 U.S. at 319, 129 S.Ct. at 2537. The Court further stated, "there is little reason to believe that confrontation will be useless in testing analysts' honesty, proficiency, and methodology—the features that are

commonly the focus in the cross-examination of experts." **Id.**, 557 U.S. at 321, 129 S.Ct. at 2538.

In **Bullcoming v. New Mexico**, 564 U.S. 647, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), the defendant was arrested for driving while intoxicated (DWI). The principal evidence against him was a forensic laboratory report certifying that his blood-alcohol concentration (BAC) was well above the threshold for an aggravated DWI offense. At trial, the prosecution did not call as a witness the analyst who completed and signed the "certificate of analyst" of the report and had been assigned to test the defendant's blood sample. Further, the prosecution did not call as a witness the examiner who reviewed the analysis and certified that the analyst who tested the sample was qualified to conduct the BAC test, and that the "established procedure" for handling and analyzing the defendant's sample "had been followed." **Id.**, 564 U.S. at 653, 131 S.Ct. at 2710-11. Instead, the State introduced the analyst's finding as a "business record" during the testimony of another analyst who was familiar with the laboratory's testing procedures, but ha[d] "neither observed nor reviewed [the analyst's] analysis." **Id.**, 564 U.S. at 655, 131 S.Ct. at 2712.

The New Mexico Supreme Court held that, although the blood-alcohol analysis was testimonial, the Confrontation Clause did not require the certifying analyst's in-court testimony, finding that the live testimony of the other analyst had satisfied the constitutional requirements. On review, in reversing the lower decision, the United States Supreme Court's holding was set forth as follows:

> The question presented is whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification *or perform or observe the test reported in the certification.* We hold that surrogate testimony of that order does not meet the constitutional requirement. The accused's right is to be confronted with the analyst who made the certification, unless that

13

analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist." (Emphasis added).

**Id.**, 564 U.S. at 652, 131 S.Ct. at 2710.[10]

In **Williams v. Illinois**, 567 U.S. 50, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012) (plurality opinion), <u>abrogated by</u> **Smith v. Arizona**, 602 U.S. 779, 144 S.Ct. 1785, 219 L.Ed.2d 420 (2024), the United States Supreme Court found no violation of the Confrontation Clause where an expert witness testified that a DNA profile produced by a private laboratory, Cellmark, from swabs taken from a rape victim matched the DNA profile produced by a state forensic analyst from a blood sample drawn from the defendant. The expert witness in **Williams** did not conduct or observe the DNA testing, but testified that based on her own comparison of the two DNA profiles, she concluded the defendant could not be excluded as a source of the semen identified in the vaginal swabs. The Cellmark report itself was neither admitted into evidence nor shown to the factfinder. The expert witness did not quote or read from the report; nor did she identify it as the source of any of the opinions she expressed. **Id.**, 567 U.S. at 61-62, 132 S.Ct. at 2230.

The Court in **Williams** gave two independent reasons for finding that the testimony was properly admitted. First, the expert's reliance on the report was not offered to prove the truth of the matter asserted[11] because the results of the DNA test were relayed by the expert solely for the purpose of explaining the assumptions on which her opinion rested. **Id.**, 567 U.S. at 56-59, 132 S.Ct. at 2227-28. Second, the DNA profile was produced before the defendant was identified as the assailant or targeted as a suspect. **Id.**, 567 U.S. at 57-59, 132 S.Ct. at 2228.

---

[10] As Justice Sotomayor pointed out in her concurrence, **Bullcoming** was "not a case in which the person testifying [was] a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." **Bullcoming**, 564 U.S. at 672, 131 S.Ct. at 2722.

[11] Subsequently in **Smith**, discussed *infra*, the United States Supreme Court found "no meaningful distinction between disclosing an out-of-court statement" to "explain the basis of an expert's opinion" and "disclosing that statement for its truth." **Smith**, 602 U.S. at 795, 144 S.Ct. at 1798 (quoting **Williams**, 567 U.S. at 106, 132 S.Ct. 2221 (Thomas, J., concurring in judgment)).

In affirming the trial court's denial of the defendant's motion to exclude the testimony under the Confrontation Clause, the Court in **Williams** stated:

> [W]e also conclude that even if the report produced by Cellmark had been admitted into evidence, there would have been no Confrontation Clause violation. The Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose. And the profile that Cellmark provided was not inherently inculpatory.

**Williams**, 567 U.S. at 58, 132 S.Ct. at 2228. The Court specifically noted that the abuses that prompted the adoption of the Confrontation Clause shared two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct; and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions. **Id.**, 567 U.S. at 82, 132 S.Ct. at 2242.

Subsequently, in **State v. Bolden**, 2011-2435 (La. 10/26/12), 108 So.3d 1159, 1161-62 (*per curiam*), the Louisiana Supreme Court held that a DNA profile created prior to the defendant becoming a suspect in the case was non-testimonial in nature. The Court stated,

> No error under the Confrontation Clause occurs when a DNA expert testifies that in his or her opinion the DNA profile developed from a sample taken from defendant matches the DNA profile developed by other, non-testifying technicians from biological samples taken from the victim of a sexual assault if: the tests on the victim's samples were conducted before the defendant was identified as the assailant or targeted as a suspect[.]

**Id.**, 108 So.3d at 1161-62 (citing **Williams**, 567 U.S. at 82-83, 132 S.Ct. at 2242-43).

In **State v. Grimes**, 2011-0984 (La. App. 4th Cir. 2/20/13), 109 So.3d 1007, *writ denied*, 2013-0625 (La. 10/11/13), 123 So.3d 1216, the appellate court

15

considered **Bullcoming, Williams**, and their progeny. In **Grimes** the defendant was convicted of aggravated rape, aggravated kidnapping, and sexual battery of two victims that occurred in the years 1993 and 1997. At the time of the attacks, the perpetrator was unknown. Sexual assault kits were collected and DNA analyses in 2005 identified the defendant as the perpetrator. On appeal, the defendant argued he was denied his constitutional rights to confront/cross-examine the analysts who performed the DNA tests in that case. Thus, the appellate court considered whether supervisors who had not performed DNA analyses could testify as to the actual analysts' findings contained in reports. **Grimes**, 109 So.3d at 1017-26.

The appellate court found no merit in the defendant's argument. Specifically, the court held DNA evidence generated before the defendant was identified as a suspect was properly admitted under **Williams**, stating, "there is no evidence that the defendant was a suspect or target in the two later cases at the time the DNA profiles were requested or produced, or that the DNA profiles in those two cases were 'prepared for the primary purpose of accusing' the defendant." **Grimes**, 109 So.3d at 1025-1026. Regarding DNA evidence generated after the defendant became a suspect in the case, the court noted the analyst who testified at trial was the "certifying" analyst on the reports at issue. Therefore, the court held, "even assuming for the sake of argument that the last two DNA profiles—generated after defendant was identified as a suspect in the first three cases—were prepared for the primary purpose of accusing defendant, and thus might have been considered testimonial statements/evidence covered by the Confrontation Clause, they nevertheless would have been admissible under **Bullcoming** and **Melendez–Diaz**." **Id.**, 109 So.3d at 1025-26. (Internal quotations omitted).

More recently, in **Smith**, which abrogated **Williams**, the United States Supreme Court held, "If an expert for the prosecution conveys an out-of-court

statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts." **Smith,** 602 U.S. at 795, 144 S.Ct. at 1798. In **Smith,** law enforcement officers found the defendant with what appeared to be drugs. **Id.,** 602 U.S. at 789, 144 S.Ct. at 1795. The analyst who tested the substances did not testify at the trial. **Id.,** 602 U.S. at 790, 144 S.Ct. at 1795. Instead, a substitute expert reviewed the lab report and the analyst's notes, referred to the materials at trial, conveyed what the documents said, and offered his opinion on the chemical nature of the substances. **Id.,** 602 U.S. at 791, 144 S.Ct. at 1795-1796. The Court held that the testifying analyst testified to the truth of the other analyst's report and remanded for the state court to determine whether the report was testimonial. **Id.,** 602 U.S. at 796-802, 144 S.Ct. at 1798-1802.

The Court noted its holding in **Smith** follows from its other holdings about the Confrontation Clause's application to forensic evidence. The Court added,

> A State may not introduce the testimonial out-of-court statements of a forensic analyst at trial, unless she is unavailable and the defendant has had a prior chance to cross-examine her. See **Crawford**, 541 U.S., at 68, 124 S.Ct. 1354; **Melendez-Diaz**, 557 U.S., at 311, 129 S.Ct. 2527. Neither may the State introduce those statements through a surrogate analyst *who did not participate* in their creation. See **Bullcoming**, 564 U.S., at 663, 131 S.Ct. 2705. And nothing changes if the surrogate—as in this case—presents the out-of-court statements as the basis for his expert opinion. Those statements, as we have explained, come into evidence for their truth—because only if true can they provide a reason to credit the substitute expert. So a defendant has the right to cross-examine the person who made them. (Emphasis added).

**Id.,** 602 U.S. at 802-803, 144 S.Ct. at 1802; see also **United States v. Turner,** 709 F.3d 1187, 1191-94 (7th Cir. 2013) (holding any error was harmless, but stating that a surrogate expert's testimony concerning analysis of a test for cocaine "put [the actual analyst's] out-of-court statements before the jury" and "allowed [the surrogate] to vouch for the reliability of [the analyst's] work[.]").

In this case, the State attempted to introduce the DNA reports into evidence during the direct examination of Mr. Shawhan, a DNA forensic supervisor at the LSPCL, after the trial court ruled him an expert in DNA forensics.[12] The trial court ruled the reports and testimony by Mr. Shawhan regarding the reports inadmissible, as a different analyst, who no longer worked at the LSPCL, performed the testing in this case. In granting the State's application for supervisory review and reversing the trial court's ruling, this court, in part, cited **Bolden**, **Grimes**, and **Williams** in finding that the expert testimony and DNA reports at issue are admissible. **McElveen**, 2022 WL 4546008 at *1.

Prior to Mr. Shawhan's testimony, Lieutenant Foster testified, without objection, the presumptive DNA testing of the backpack led to the identification of the defendant. The backpack was recovered and collected in the normal course of business prior to the defendant being identified as a suspect. The primary purpose of the collection and subsequent testing was to catch the criminals who had committed the offenses, not to target the defendant. The defendant concedes the presumptive test results, generated before the defendant was identified as the assailant or targeted as a suspect, were properly admitted in this case. As Lieutenant Foster also testified, without objection, he collected DNA reference samples from the defendant after his arrest and sent the samples to the lab. Finally, Lieutenant Foster testified, again without objection, that the subsequent lab report confirmed the presumptive match, specifically showing the defendant's DNA was on the backpack.

Mr. Shawhan likewise testified regarding the presumptive match generated before the defendant became a suspect in this case. As to his testimony regarding the final test results, generated after the defendant was developed as a suspect and arrested in this case, we note Mr. Shawhan testified he participated in the 2018

---

[12] We note the trial court prompted its own ruling on the evidence. The defense attorney later noted he was in agreement with the trial court and objected for the record.

technical review process for the DNA analyses in this case. Specifically, he served as the technical reviewer whose role was to verify and confirm all of the policies and procedures "[a]t every step of the process[.]" As a LSPCL DNA forensic supervisor, Mr. Shawhan evaluated the analysis process in this case and verified that it upheld the lab's policies and procedures. Mr. Shawhan testified the steps of technical review included "putting on the analyzer . . . and the results that go into a report." Mr. Shawhan also stated his verification included, "screening, extraction, quantification, amplification, genetic analyzer, and interpretation."

Based on our review of the jurisprudence and the record in its entirety, we are convinced that our pretrial determination in this matter was not patently erroneous and did not produce an unjust result. The defendant was not a suspect or target when the presumptive test results were generated. Thus, the report and testimony by both Lieutenant Foster and Mr. Shawhan regarding the evidence recovered, submitted, and tested, and the results of presumptive analysis were properly admitted under **Williams**[13] and **Bolden**. Regarding the supplemental DNA results generated after defendant was identified as a suspect in this case, Mr. Shawhan reviewed every step of the process to verify that the established procedure for handling and analyzing the defendant's sample had been followed. Assuming the supplemental results generated after the defendant was identified as a suspect in this case were testimonial, the State was properly allowed to introduce them through Mr. Shawhan, a participant in the process. Thus, the supplemental report and related testimony were properly admitted under **Smith, Bullcoming, and Melendez–Diaz**.[14] See also **State v. Chisolm**, 49,043 (La. App. 2d Cir.

---

[13] The United States Supreme Court was silent in **Smith** regarding the second reason the **Williams** court gave for finding no violation of the Confrontation Clause in that case, that the DNA profile was produced before the defendant was identified as the assailant or targeted as a suspect, relied on in **Bolden** and **Grimes**.

[14] We note the defendant may have waived his right of confrontation by failing to timely file a written demand for the analyst who performed the tests to testify, pursuant to La. R.S. 15:501(B).

5/14/14), 139 So.3d 1091, 1102, writ denied, 2014-1203 (La. 3/13/15), 176 So.3d 1031 (court found no error where expert witness performed a technical review of analyst's work and confirmed proper protocols were used, examined the data, and testified regarding her own conclusions); **State v. Welch**, 2012-1531 (La. App. 1st Cir. 3/22/13), 115 So.3d 490, 498 (considering his credentials and explanation of the test results, this court found no confrontation clause violation in allowing a forensic toxicologist to testify on the basis of the report by his fellow toxicologist).

Moreover, even if we were to find, in light of **Smith**, that the admission of testimonial statements through a surrogate analyst violated the Confrontation Clause, confrontation errors are subject to a harmless error analysis. See **Delaware v. Van Arsdall**, 475 U.S. 673, 680-81, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); **State v. Patton**, 2010-1841 (La. App. 1st Cir. 6/10/11), 68 So.3d 1209, 1218. Factors to be considered by the reviewing court include: the importance of the testimony in the prosecution's case; whether the testimony was cumulative; the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; the extent of cross-examination otherwise permitted; and the overall strength of the prosecution's case. **Van Arsdall**, 475 U.S. at 684, 106 S.Ct. at 1438; **State v. Wille**, 559 So.2d 1321, 1332 (La. 1990), cert. denied, 506 U.S. 880, 113 S.Ct. 231, 121 L.Ed.2d 167 (1992). The verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial is surely unattributable to the error. **Sullivan v. Louisiana**, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993).

---

See La. R.S. 15:499, et seq. (Louisiana's statutory scheme which requires a defendant to exercise his Confrontation Clause rights prior to trial); **State v. Simmons**, 2011-1280 (La. 1/20/12), 78 So.3d 743, 746-47 (per curiam). Although the record does not reflect the State filed formal notice, pursuant to La. R.S. 15:501(A), of its intent to introduce the crime lab reports. According to the record, it appears the State's production of discovery included copies of the lab reports as attachments. See **State v. Young**, 552 So.2d 669, 672 (La. App. 2d Cir. 1989). However, rather than merely offering the reports as proof, the State elected to call Mr. Shawhan as a witness to testify as an expert in DNA forensics.

Herein, the supplemental test results merely verified and confirmed the presumptive CODIS match. The backpack, which was subjected to two DNA tests, was also seen on the video footage evidence and found near the crime scene. Therefore, Mr. Shawhan's testimony on the results of the supplemental DNA report was cumulative of testimony presented by Lieutenant Foster. Finally, the defendant was identified as one of the assailants by a tipster. Accordingly, we find that the verdicts in this case were surely unattributable to any error in the admission of the supplemental test results and Mr. Shawhan's related testimony. Thus, under a harmless error analysis, the defendant fails to show his entitlement to relief. See **State v. West**, 2024-00133 (La. 11/6/24), ___ So.3d ___, ___, 2024 WL 4688793, *2. Considering the foregoing, we find no merit in assignment of error number two.

## ASSIGNMENT OF ERROR NUMBER THREE

In assignment of error number three, the defendant contends the trial court erred in including an instruction on flight in pre-deliberation jury instructions. He argues there was no evidence to support the claim that he fled the jurisdiction. He further argues the instruction was not harmless considering the evidence in this case.

The trial court must instruct the jury on the law applicable to the case. La. Code Crim. P. art. 802(1). In analyzing jury instructions, the cases caution against taking certain phrases out of context of the charge as a whole. The test articulated is whether, taking the instruction as a whole, reasonable persons of ordinary intelligence would understand the charge. **State v. West**, 568 So.2d 1019, 1023 (La. 1990); **State v. Leger**, 2017-0461 (La. App. 1st Cir. 5/11/20), 303 So.3d 337, 346 (on remand). As stated by the Louisiana Supreme Court, "a great deal of credit should be accorded to the good sense and fairmindedness of jurors who have heard the evidence and who know what was and was not proven." **State v. Dupre,**

21

408 So.2d 1229, 1234 (La. 1982); **State v. Brown**, 2020-0150 (La. App. 1st Cir. 2/19/21), 2021 WL 650816, *14 (unpublished), writ denied, 2021-00458 (La. 6/1/21), 316 So.3d 835.

Herein, over the defendant's objection, the trial court provided the following instruction to the jury:

> *If you find* that the defendant fled immediately after a crime was committed or after he was accused of a crime, the *flight alone* is not sufficient to prove that the defendant is guilty. However, flight may be considered along with all other evidence. You must decide whether such flight was due to consciousness of guilt or to other reasons unrelated to guilt. [Emphasis added]

An instruction on flight is permitted in criminal cases where it is supported by the evidence. **State v. Hollins**, 2023-0785 (La. App. 1st Cir. 3/19/24), 387 So.3d 641, 650.

We find the evidence of flight was sufficient to warrant the above instruction. Without objection, Lieutenant Foster testified he looked for the defendant after receiving the presumptive DNA test results and subsequent tip. He stated the FBI "tirelessly" assisted him in the search and ultimately discovered the defendant was no longer in Louisiana, but in Texas. Lieutenant Foster further testified members of the defendant's family "got" the defendant to turn himself in. Defense counsel had the opportunity to cross examine Lieutenant Foster on this testimony. Further, a great deal of credit should be given to the jurors who were instructed to assess the evidence to determine if the defendant fled in this case. Considering the foregoing, we find no error in the trial court's inclusion of an instruction on flight. Accordingly, we find assignment of error number three lacks merit.

## ASSIGNMENT OF ERROR NUMBER FOUR

In assignment of error number four, the defendant contends his trial counsel was constitutionally deficient in failing to challenge this court's decision on the

mid-trial writ regarding the admissibility of the DNA evidence. He further notes his counsel failed to call his mother to testify or give adequate notice to call an alibi witness to testify. Finally, he argues his counsel rendered ineffective assistance at sentencing.

A claim of ineffective assistance of counsel is generally relegated to post-conviction proceedings, unless the record permits definitive resolution on appeal. **State v. McMillan**, 2009-2094 (La. App. 1st Cir. 7/1/10), 43 So.3d 297, 302, writ denied, 2010-1779 (La. 2/4/11), 57 So.3d 309. A claim of ineffectiveness of counsel is analyzed under the two-pronged test developed by the United States Supreme Court in **Strickland v. Washington**, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In order to establish that his trial attorney was ineffective, the defendant must first show that the attorney's performance was deficient, which requires a showing that counsel made errors so serious that he was not functioning as counsel guaranteed by the Sixth Amendment. Secondly, the defendant must prove that the deficient performance prejudiced the defense. **McMillan**, 43 So.3d at 302. This element requires a showing that the errors were so serious that the defendant was deprived of a fair trial; the defendant must prove actual prejudice before relief will be granted. It is not sufficient for the defendant to show that the error had some conceivable effect on the outcome of the proceeding. Rather, he must show that, but for the counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. However, it is unnecessary to address the issues of both counsel's performance and prejudice to the defendant if the defendant makes an inadequate showing on one of the components. **Id.** at 302-303.

Decisions relating to investigation, preparation, and strategy require an evidentiary hearing, and therefore, cannot possibly be reviewed on appeal. **State**

**v. Bias**, 2014-1588 (La. App. 1st Cir. 4/24/15), 167 So.3d 1012, 1021, <u>writ denied</u>, 2015-1051 (La. 5/13/16), 191 So.3d 1053. Further, under our adversary system, once a defendant has the assistance of counsel, the vast array of trial decisions, strategic and tactical, which must be made before and during trial, rests with an accused and his attorney. The fact that a particular strategy is unsuccessful does not establish ineffective assistance of counsel. Furthermore, "[t]he election to call or not call a particular witness is a matter of trial strategy and not, per se, evidence of ineffective counsel." **State v. Folse**, 623 So.2d 59, 72 (La. App. 1st Cir. 1993).

We note the defendant's first claim of ineffective assistance of counsel fails, as he cannot show prejudice as a result of the admission of DNA evidence. In addition to this court finding the DNA evidence admissible in the mid-trial writ ruling, we further have addressed the issue on appeal, finding no merit in the assignment of error. Thus, in the absence of prejudice to the defendant, there is no need to determine whether counsel's performance was deficient. We further note the defendant's argument regarding his counsel's adequacy at sentencing is pretermitted due to this court's finding, discussed *infra*, on assignment of error number six. Finally, the other deficiencies alleged by the defendant on appeal address matters of trial preparation and strategy, which cannot be reviewed on appeal. Therefore, assignment of error number four is without merit or otherwise not subject to appellate review.

### ASSIGNMENT OF ERROR NUMBER FIVE

In assignment of error number five, the defendant argues the trial court erred in failing to hold a hearing on his *pro se* motions for new trial. He argues his motions presented numerous claims that required a hearing.

As the State notes in its brief on appeal, the defendant did not request a hearing on the motions for new trial below, nor did he object to the trial court's ruling or lack of a hearing. An irregularity cannot be availed of after the verdict

24

unless it was objected to at the time of the occurrence. La. Code Crim. P. art. 841(A). The contemporaneous objection rule has two purposes: to put the trial judge on notice of the alleged irregularity so that he may cure the problem, and to prevent the defendant from gambling on a favorable verdict and then resorting to appeal on errors that might easily have been corrected by an objection. **State v. Cockerham**, 2017-0535 (La. App. 1st Cir. 9/21/17), 231 So.3d 698, 708, writ denied, 2017-1802 (La. 6/15/18), 245 So.3d 1035. Thus, to preserve an issue for appellate review, a party must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for the objection. See La. Code Crim. P. art. 841(A); See also **State v. Johnson**, 2015-0513 (La. App. 1st Cir. 12/23/15), 185 So.3d 822, 829, writ denied, 2016-0174 (La. 2/3/17), 215 So.3d 688. Thus, we find this issue was not preserved for appellate review.

Furthermore, the defendant submitted his motions for new trial without argument. There was nothing to suggest that he intended to call any witnesses or submit any evidence in support of his motions, or that he was prevented from doing so. Accordingly, the trial court did not err or abuse its discretion in ruling on the motions without a hearing. We find no merit in assignment of error number five.

## ASSIGNMENT OF ERROR NUMBER SIX/PATENT ERROR REVIEW

In assignment of error number six, the defendant argues the trial court erred in failing to observe the statutorily required twenty-four-hour delay, prior to the imposition of the sentences. We agree.

Herein, the defendant filed motions for new trial and post-verdict judgment of acquittal, and the trial court denied them on the day of sentencing, just prior to the imposition of the sentences. However, under La. Code Crim. P. art. 873, in pertinent part, "[i]f a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is

overruled." There is no indication in the record the defendant waived the delay in this case. Thus, the trial court erred by sentencing the defendant immediately after ruling on the motion for new trial.

In **State v. Augustine**, 555 So.2d 1331, 1333-34 (La. 1990), the Louisiana Supreme Court noted that a failure to observe the twenty-four-hour delay provided in Article 873 may be considered harmless error where the defendant could not show that he suffered prejudice from the violation, and sentencing is not raised on appeal. See **State v. Stafford**, 2020-0299 (La. App. 1st Cir. 2/22/21), 321 So.3d 965, 969. Where, however, a defendant does challenge his sentence, failure to follow the required twenty-four-hour delay renders a sentence void. **Augustine**, 555 So.2d at 1333 (citing **State v. Mistich**, 186 La. 174, 171 So. 841 (1937) and **State v. George**, 218 La. 18, 48 So.2d 265 (1950), cert. denied, 340 U.S. 949, 71 S.Ct. 528, 95 L.Ed. 684 (1951)).

In this case, through a claim of excessiveness, the defendant is challenging his sentences, thus meeting the requirements of **Augustine** for remand. See **State v. Pursell**, 2004-1775 (La. App. 1st Cir. 5/6/05), 915 So.2d 871, 874. Additionally, as stated, the record does not contain an expressed or even an implicit waiver of the sentencing delay. While defense counsel did not contest or object to moving on to sentencing after the rulings on the motions, in **State v. Kisack**, 2016-0797 (La. 10/18/17), 236 So.3d 1201, 1205 (*per curiam*), cert. denied, 583 U.S. 1160, 138 S.Ct. 1175, 200 L.Ed.2d 322 (2018), the Louisiana Supreme Court found the defense counsel's participation in the sentencing hearing was insufficient to constitute a waiver of the delay required by Article 873. As further observed by the court, "[a]n implicit waiver . . . runs afoul of the plain language of Art. 873 that requires that the waiver be expressly made." **Id.** Therefore, given the circumstances presented, we must vacate the defendant's sentences and remand the case to the trial court for resentencing. See **Augustine**,

26

555 So.2d at 1333-1335; **State v. Denham**, 2001-0400 (La. App. 1st Cir. 12/28/01), 804 So.2d 929, 932, <u>writ denied</u>, 2002-0393 (La. 1/24/03), 836 So.2d 37.

Because we find that **Augustine** requires the reversal of the defendant's sentences and remand for resentencing, it is at this time premature to review the merits of the defendant's excessiveness claim raised in assignment of error number seven. <u>See</u> **State v. Thompson**, 2010-2254 (La. App. 1st Cir. 6/10/11), 2011 WL 3423798, *1 (unpublished). However, we note that, when resentencing the defendant, the trial court should advise him of the time limitations provided by La. Code Crim. P. art. 930.8(A) for applying for post-conviction relief. The sentences are hereby vacated, and the matter is remanded to the trial court for resentencing in accordance with this opinion. We pretermit discussion of the merits of assignment of error number seven.

**CONVICTIONS AFFIRMED; SENTENCES VACATED AND REMANDED FOR RESENTENCING.**

# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

# 2023 KA 0939

# STATE OF LOUISIANA

# VERSUS

# BJ McELVEEN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**McClendon, J., dissenting.**

In light of the United States Supreme Court's opinion in **Smith v. Arizona**, 602 U.S. 779, 144 S. Ct. 1785, 219 L. Ed. 2d 420 (2024), I must respectfully disagree.